

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-76,834

### STANLEY LAMAR GRIFFIN, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. 10-05176-CRF-361
### IN THE 361ST JUDICIAL DISTRICT COURT
### BRAZOS COUNTY

YEARY, J., filed a dissenting opinion in which KELLER, P.J., and MEYERS, J., joined.

### DISSENTING OPINION

Because I believe that the evidence was sufficient to establish that Appellant caused Jennifer Hailey's death while in the course of kidnapping Cameron Lockhart, I dissent to reforming the judgment to reflect conviction for the lesser-included offense of murder and remanding for a new punishment proceeding. Furthermore, because Appellant has asserted

no guilt phase trial error, and because I find no trial error that was committed at the punishment phase, I would affirm the trial court's judgment in all respects.

## STATEMENT OF FACTS

Appellant was charged with intentionally causing Jennifer Hailey's death while he was in the course of committing or attempting to commit the offense of kidnapping against Cameron Lockhart. Viewed in the light most favorable to the verdict, the trial record shows that Appellant met Jennifer[1] and her nine-year-old son, Cameron, when Jennifer and Appellant's girlfriend, Andrea Copelyn, worked at the same medical clinic. Jennifer and Cameron sometimes saw Appellant at the clinic when he came in to pick up Copelyn after work. They would also see Appellant when Copelyn's daughter babysat Cameron in the home where Copelyn, her three children, and Appellant lived.

Appellant and Copelyn began dating in the spring of 2006, and they began living together in February or March 2007. Appellant physically abused Copelyn on several occasions. When Copelyn learned that Appellant had also abused her son, she decided to leave Appellant in order to protect her children. On July 24, 2010, Copelyn and her children moved out of the house. Appellant had to move out when the lease ended on July 31. However, Copelyn and Appellant continued having a romantic relationship, and Appellant continued interacting with Copelyn's co-workers at the clinic. Appellant believed that

---

[1] I will refer to Jennifer Hailey and other members of the Hailey family by their first names.

Copelyn would let him live with her again if he did "something good," such as finding a job or completing a spiritual development program.

On September 17, 2010, Copelyn met Appellant at the mission where he was staying so that they could go to church services together. Appellant wanted to go home with Copelyn, but she told him that he could not live with her again until her children went off to college. Appellant became very upset. He climbed into Copelyn's car and refused to get out. He yelled repeatedly for Copelyn to take him home. People who overheard the noise intervened on Copelyn's behalf so that she could leave. As a result of this outburst, Appellant was barred from the mission.

Some time after midnight, Appellant went to Copelyn's house. He knocked on her front door, but she did not answer. She saw him looking through the windows before he left.

On September 19, 2010, around 10:00 p.m., Appellant asked an acquaintance to drop him off near a friend's apartment. Appellant did not name the person he intended to visit. Once at the apartment complex, Appellant went to the two-bedroom apartment where Jennifer and Cameron lived. Appellant had never been to their apartment before.

Cameron had gone to bed at 9:00 p.m., but after sleeping for a couple of hours, he got up to get a drink of water. As he walked toward the kitchen, he saw Appellant and Jennifer in the living room. Appellant was on top of Jennifer on the couch. It looked to Cameron like Appellant was hugging her, and he later told an investigating officer that he had seen Appellant with his hands around Jennifer's throat. Jennifer was face down, and Cameron

could see that her hand was moving a little bit. Cameron called out to her. Appellant appeared startled and raised up. Cameron asked, "Stanley, what are you doing?" Appellant replied that he was not "Stanley"; rather, he was "Michael from Huntsville." He told Cameron to go back to bed and Cameron complied.

Ten or fifteen minutes later, Cameron again left his bedroom. As he stood in the hallway, he could see Jennifer lying face up on the floor of her bedroom. Cameron could not tell if she was hurt. He knew from experience that Jennifer fainted easily. Cameron told Appellant that he had to go to the bathroom. Although there was a bathroom across the hall from Cameron's bedroom, Cameron went to the bathroom in his mother's room. He was able to take a closer look at Jennifer, but he was still unable to ascertain whether she was hurt.

As Cameron walked out of his mother's room, Appellant told Cameron that he wanted to "chill" with him. Hoping that Appellant would leave, Cameron told Appellant that he was going back to bed. Cameron walked toward his bedroom, but Appellant grabbed him from behind and choked him. Appellant struck Cameron's jaw, back, and neck with a garden trowel he had retrieved from the utility room. Cameron passed out in the hallway. When Cameron awoke, Appellant was no longer in the apartment. Cameron was lying on the living room floor under a comforter that had been taken from Jennifer's bed. Jennifer was lying in her bedroom. Cameron could not wake her up and thought that she was dead. He called his grandmother, Nancy Hailey, around 5:00 a.m. Nancy then called 9-1-1 and her son, Jayson Hailey.

Jayson reached Jennifer's apartment shortly before emergency responders did. Cameron opened the door for him and told him what had happened. Jayson entered Jennifer's bedroom and observed that her hair, matted with dried blood, was covering her face. He picked her up, intending to take her to the hospital, but as he carried her, he concluded that she needed more immediate care. He lay her down near the front door to perform CPR. When he moved Jennifer's hair away from her face, he saw that her face was purple and swollen. The chest compressions associated with performing CPR caused blood to come out of her mouth.

Emergency responders observed a big gash on Cameron's neck and smaller gashes on the side of his face. They transported Cameron to the hospital. Cameron had lost a significant amount of blood, but he survived his injuries.

## SUFFICIENCY OF THE EVIDENCE

Whether the jury could rationally conclude that Appellant kidnapped Cameron on this record depends upon whether it could rationally find: (1) that Appellant "restrained" him and, if so, (2) that Appellant also "abducted" him. That is to say, did Appellant "restrain" Cameron with the additional specific intent to ultimately prevent Cameron's liberation—intending to accomplish that ultimate goal either by secreting or holding him in a place where he was not likely to be found, or by using or threatening to use deadly force against him? In order to accomplish an abduction, Appellant need not have *actually* secreted or held Cameron, or used or threatened to use deadly force; he need only have had the *intent*

to do so at the time he *restrained* Cameron. *Laster v. State*, 275 S.W.3d 512, 521 (Tex. Crim. App. 2009); *Santellan v. State*, 939 S.W.2d 155, 162 (Tex. Crim. App. 1997); *Mason v. State*, 905 S.W.2d 570, 575 (Tex. Crim. App. 1995); *Brimage v. State*, 918 S.W.2d 466, 475 (Tex. Crim. App. 1994) (plurality opinion on original submission).

**Restraint:** The simple "restraint" element can be accomplished by either moving or confining the victim "so as to interfere substantially" with the victim's liberty. It is true that Appellant did not literally pick Cameron up and carry him, or otherwise physically move Cameron. He simply told Cameron, "Go back to your bed. Go back to your room[,]" and Cameron complied. But the Court should not construe the definition of restraint to require that the actor himself physically move his victim from one place to another. It is enough that he cause the victim somehow to move or be moved. Otherwise, it would not be possible for purposes of "restraint" to move a victim from one place to another "by . . . intimidation or deception[.]" TEX. PENAL CODE § 20.01(1)(A). Neither of these statutorily contemplated means of moving a victim—intimidation or deception—necessarily requires the actor himself to have physically moved the victim. So long as the actor causes the victim to move or be moved without consent from one place to another "so as to interfere substantially with [the victim's] liberty," *id*. § 20.01(1), he has perpetrated a restraint. The jury might rationally have concluded that Appellant "moved" Cameron by this definition. Moreover, the jury might rationally have concluded that, as an adult instructing Cameron in no uncertain terms to go back to his bedroom, Appellant also effectively "confined" him there.

With this understanding of the "restraint" element, the evidence in this case would permit the jury to conclude that Appellant "restrained" Cameron. He caused Cameron to "move" to his bedroom "by . . . any means," including by simply telling him to do so, and he also thereby "confined" him. TEX. PENAL CODE § 20.01(1)(B)(I). The fact that Cameron acquiesced does not establish that the restraint was consensual, since Cameron was less than 14 years old and his mother did not acquiesce. *See id*. (restraint is non-consensual "if it is accomplished by . . . any means, including acquiescence of the victim, if" the victim is younger than 14 and the parent has not acquiesced in the victim's movement or confinement).

**Abduction:** Does the evidence also establish that Appellant "abducted" Cameron? While Appellant restrained Cameron, did he also have the specific intent, not just to substantially *interfere* with his liberty, but to actually "*prevent* his liberation by . . . [either] secreting or holding him in a place where he is not likely to be found [or] using or threatening to use deadly force"? *See Laster*, 275 S.W.3d at 521 ("The offense of kidnapping is legally completed when the defendant, at any time during the restraint, forms the intent to prevent liberation by secreting or holding another in a place unlikely to be found."). In my view, the evidence supports a rational inference that when Appellant restrained Cameron, he did in fact harbor the additional intent, not just to interfere with his liberty, but to prevent his liberation—if not only by "secreting or holding" him, then also by using deadly force against him in order to dispatch the only witness to Jennifer's murder. The jury might rationally have concluded that, even as of the time that Appellant instructed Cameron to go back to bed—and

in any event at *some* point during the restraint, he formulated the intent to secret or hold

Cameron or even to kill Cameron so that Cameron could not later be a witness against him.

Thus, the jury could reasonably have concluded, the purpose of Cameron's initial restraint was

to hold Cameron in a place from which he could not interfere with Appellant's assault upon

Jennifer or communicate with someone else who might interfere. Alternatively, the jury might

rationally have concluded that, when Appellant initially restrained Cameron, his purpose was

to ensure that Cameron would never be liberated, a goal that Appellant intended to accomplish

by later using deadly force against him. Viewed in the light most favorable to the jury's

verdict, the evidence supports a finding beyond a reasonable doubt that Appellant abducted,

and hence kidnapped, Cameron.[2]

Indeed, Appellant does not vigorously contest that he kidnapped Cameron. He argues,

however, that the evidence fails to show that Jennifer's murder occurred during the course of

Cameron's kidnapping. Specifically, he contends:

> "[s]he had been murdered before [A]ppellant said or did anything to Cameron
> Lockhart. At most, the State's evidence may show a kidnapping in the course
> of a murder. This theory of capital murder is contrary to the plain language of
> *Texas Penal Code*, Sec. 19.03(a)(2). *See Herrin v. State*, 125 S.W.3d 436, 440
> n.7 (Tex. Crim. App. 2002)."

Appellant's Brief at 12.

---

[2] Appellant's conduct fits within the statutory definitions of "restraint" and "abduction" as those terms have been authoritatively construed by this Court, which were submitted to the jury in this case. The jury was authorized to convict Appellant of capital murder or, failing that, the lesser included offense of murder. The jury convicted Appellant of the greater offense, which establishes that it was persuaded beyond a reasonable doubt that Appellant's conduct satisfied the statutory criteria for conviction for capital murder, including the kidnapping element.

In *Herrin*, the Court observed that, when it comes to a murder alleged as capital because it was committed in the course of also committing the predicate offense of kidnapping, "[t]he critical question is whether the murder was committed in the course of the kidnapping or attempted kidnapping, not the other way around." 125 S.W.3d at 440. Appellant argues that the evidence shows that he had already completed Jennifer's murder by the time he restrained Cameron, that the kidnapping was an "afterthought," and that it cannot therefore be said that he murdered her "in the course of" kidnapping Cameron. *See id.* at 440 n. 6 ("The same principle applies in the robbery/capital murder context. If the robbery is committed as an afterthought and unrelated to the murder, the State has not proven the murder was committed in the course of the robbery."). As is the case with a murder that is a capital offense because committed in the course of a robbery, to be a capital offense, the "intent to [kidnap] must be formed before or at the time of the murder." *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995). Appellant contends that there is insufficient evidence to permit a jury to rationally conclude that he formed an intent to kidnap Cameron "before or at the time of" the murder. *Santellan*, 939 S.W.2d at 164. I disagree.

The medical examiner testified that Jennifer's cause of death was "homicide asphyxia to include strangulation," and that the deprivation of oxygen to her brain killed her. He also testified that to cause death in this way is not a quick process:

> Q. And so to be killed by strangulation does there have to be pressured [sic] applied after the person is motionless?
>
> A. Yes.

Q. For how long?

A. We're talking for a good minute, two, maybe even three.

Cameron told an investigating officer that when he first saw Appellant and his mother in the living room, he saw Appellant "on top of his mother with his hands around her throat holding her down on the couch."[3] Cameron himself seemed less sure of exactly what he saw, testifying that "I couldn't really tell -- the last thing I would know is he was choking her. From my angle I guess he was just hugging her or something like that." At any rate, when asked whether at this time he could see Jennifer's hand moving, Cameron answered, "Yeah, a little bit." When Cameron re-emerged later from his bedroom, Jennifer had been moved from the living room to her bedroom, but by this time she was no longer moving at all. A rational jury could conclude from the totality of circumstances that, by the time Appellant told Cameron to return to his room, thus abducting him, he had not yet applied the sustained pressure to Jennifer's neck needed to not only incapacitate her, but also to cause her death by strangulation. This evidence indicates that, while Appellant may have already begun to strangle Jennifer when Cameron first interrupted him, he did not finish the job until after he had restrained Cameron by sending Cameron back to his room. The jury could have credited this evidence in order

---

[3] The Court has no occasion to decide whether the investigator's testimony here constituted objectionable hearsay, since Appellant did not object on that basis at trial. Unobjected-to hearsay has probative value. TEX. R. CR. EVID. 802; *Poindexter v. State*, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005). Furthermore, even had the investigator's testimony been erroneously admitted over an objection, the Court would still take it into account in ~~our~~ its sufficiency analysis. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013).

rationally to conclude that Appellant had initiated Cameron's kidnapping before or at the time he killed Jennifer.

Appellant insists, however, that the evidence must show that he murdered Jennifer in order to "facilitate" Cameron's kidnapping, and "not the other way around." *Herrin*, 125 S.W.3d at 440. Even if Jennifer was still alive when Appellant restrained Cameron, he maintains, it was not a capital murder because the kidnapping was committed to facilitate the murder rather than the murder facilitating the kidnapping. It is true that we said that, in the context of murder/robbery, in order to be a capital offense, the murder must "facilitate the taking of the property." *Id*. n.6 (quoting *Moody v. State*, 827 S.W.2d 875, 892 (Tex. Crim. App. 1992)). This notion that a capital murder under Section 19.03(a)(2) of the Penal Code must be committed to "facilitate" the commission of the predicate offense apparently derives from the statutory language requiring that the murder be committed "in the course of committing" that predicate offense. *Id*. But our decision in *Herrin* itself did not turn on this "facilitation" construction of the phrase "in the course of committing."[4] I would reject this construction because I think it represents a less expansive understanding of "in the course of committing" than the Legislature intended. It is enough to effectuate the legislative purpose that the evidence show that Appellant had begun to commit the predicate offense of kidnapping "before or at the time of" the commission of the murder.

---

[4] Even with respect to the murder-in-the-course-of-committing-robbery theory of capital murder in *Herrin*, the Court simply asked whether the intent to rob was formulated "before or at the time of the murder." 125 S.W.3d at 441.

*Herrin* cited *Moody* for the proposition that "facilitation" is required. *Moody* (which also did not depend on the "facilitation" construction of "in the course of committing" for its holding and, indeed, did not even involve a sufficiency of the evidence claim) in turn cited *Ibanez v. State*, 749 S.W.2d 804, 807 (Tex. Crim. App. 1986). In *Ibanez*, we observed that "[a] killing and unrelated taking of property do not constitute capital murder under [Section] 19.03(a)(2): the State must prove a nexus between the murder and theft, i.e.[,] that the murder occurred in order to facilitate the taking of the property." 749 S.W.2d at 807. *Ibanez*, in turn, cited three opinions of this Court,[5] none of which used any form of the word "facilitate" to convey the idea that, for a murder to be capital, it must be committed "in the course of" robbery or one of the other predicate felonies listed in Section 19.03(a)(2). In fact, I find no prior case that squarely holds as much.

I do not believe that the statutory language, while it undoubtedly requires some level of relatedness of the murder to the predicate offense, necessarily requires that it must *facilitate* (*i.e.*, "to make easier or less difficult")[6] the commission of the predicate offense. If that were what the Legislature meant, it would likely have used language similar to that which is found in the felony murder statute. There, the Legislature proscribed causing the death of an individual "in the course of *and in furtherance of* the commission" of a predicate felony

---

[5] *O'Pry v. State*, 642 S.W.2d 748, 761-63 (Tex. Crim. App. 1982) (Opinion on reh'g); *Autry v. State*, 626 S.W.2d 758, 762-63 (Tex. Crim. App. 1982); *Cannon v. State*, 691 S.W.2d 664, 675 (Tex. Crim. App. 1985).

[6] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED, at 812 (2002).

offense. TEX. PENAL CODE § 19.02(b)(3)(emphasis added).[7] At the same time, the phrase "in the course of committing" is certainly narrower than the phrase "the same transaction," to be found in the mass murder subsection of the capital murder statute. *See* TEX. PENAL CODE § 19.03(a)(7)(A) (making it a capital offense to murder more than one person "during the same criminal transaction").[8] I think it enough to distinguish the phrase "in the course of committing" from these other two statutory phrases to say that it requires that an accused have initiated the commission of the predicate offense either "before, or as," he committed murder. *E.g.*, *White v. State*, 779 S.W.2d 809, 815 (Tex. Crim. App. 1989).

Accordingly, I would hold that a murder need not facilitate the commission of the predicate offense in order to have been committed "in the course of" the predicate offense. It is sufficient that the actor initiated the commission of the predicate offense at some point

---

[7] The Penal Code does not define the phrase "in furtherance of." The word "furtherance" has been defined to mean (reminiscent of "facilitate") "a helping forward: ADVANCEMENT, PROMOTION." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED, at 924 (2002). Black's defines "furtherance" to mean "[t]he act or process of facilitating the progress of something or of making it more likely to occur; promotion or advancement." BLACK'S LAW DICTIONARY, at 790 (10th ed. 2009). *See Bigon v. State*, 252 S.W.3d 360, 366 (Tex. Crim. App. 2008) (recognizing a similar dictionary definition of "furtherance" for felony murder purposes). *Cf.* TEX. PENAL CODE § 7.02(b) (assigning party liability to an actor who was a member of a conspiracy for the felonious conduct of another actor so long as that other actor's conduct was, among other things, "in furtherance of" the conspiracy—*i.e.*, the other actor's conduct advanced, promoted or facilitated the conspiracy).

[8] A murder committed "during the same transaction" as a predicate felony would presumably not even require that the intent to commit the predicate felony be formulated at or before the time the murder was committed, so long as both offenses occurred "in a continuous and uninterrupted chain of conduct occurring over a very short period of time" or "in a rapid sequence of unbroken events." *Coble v. State*, 871 S.W.2d 192, 197-99 (Tex. Crim. App. 1993); *Rios v. State*, 846 S.W.2d 310, 314 (Tex. Crim. App. 1992).

before or during the time he engages in the conduct that results in the murder. This is as much "nexus" as the Legislature meant to require in the capital murder-in-the-course-of-a-felony context. While murder in the course of committing one of the predicate felonies may often incidentally serve to facilitate the commission of the predicate felony, I do not believe the Legislature intended that to be a prerequisite to a conviction for capital murder under Section 19.02(a)(2).[9] An offender who goes on to commit a completely gratuitous murder while carrying out one of felonies designated under the statute is surely still guilty of committing a murder "in the course" committing the predicate felony, regardless of whether the murder "facilitated" the predicate felony.

Because there is evidence from which the jury could have rationally concluded that Appellant had in fact kidnapped Cameron (having restrained him with the requisite intent to constitute abduction) as he was still engaging in the protracted conduct by which he eventually caused Jennifer's death, a rational jury could have concluded that he committed murder in the course of committing kidnapping. We  need not also decide whether the

---

[9] To illustrate: Suppose an arsonist who was about to set the blaze to destroy his warehouse for purposes of fraudulently collecting insurance proceeds unexpectedly encountered the night watchman and intentionally killed him. This would certainly constitute a capital murder, since killing the watchman may have been necessary to the arsonist's purpose. Under these circumstances, the murder certainly "facilitated" the arson. But there is no reason to suppose that the Legislature intended to limit the concept of murder "in the course of" committing arson to such a scenario. Suppose the watchman was inside the warehouse, and the arsonist set the blaze for the purpose of collecting the insurance proceeds, but also, he incidentally intended to kill the watchman whom he happened to dislike for reasons quite apart from his motive for setting the blaze. Such an intentional murder would hardly facilitate the arson. And yet, it is hard to accept that the Legislature might have intended for the first hypothetical to encompass capital murder, but not the second. Nothing about the phrase "in the course of committing" forces us to incorporate the "facilitation" concept to rule out capital murder in our second hypothetical.

Jennifer's murder "facilitated" Cameron's kidnapping. I would overrule Appellant's first point of error and proceed to a review of the balance of Appellant's points of error.

FIFTH AMENDMENT

In points of error two through four, Appellant asserts that the trial court violated Article 1, Section 10, of the Texas Constitution, Article 38.08 of the Code of Criminal Procedure, and the Fifth Amendment to the United States Constitution. Specifically, Appellant complains that the trial court erroneously overruled his objection that the prosecutor improperly placed Appellant's failure to testify into evidence when the prosecutor elicited Dr. Timothy Proctor's testimony that Appellant refused to speak to Proctor about details of the offense. Contrary to Appellant's allegations, the record shows that Proctor did not testify that Appellant refused to speak to him about details of the offense. Rather, Proctor testified that he did not discuss the facts of the offense with Appellant because the court had instructed him not to. Accordingly, these points of error are without merit because the record does not support the factual allegations upon which they rely. I would overrule points of error two through four.

In points of error five through seven, Appellant asserts that the trial court violated Article 1, Section 10, of the Texas Constitution, Article 38.08, and the Fifth Amendment to the United States Constitution. Specifically, Appellant complains that the trial court erroneously overruled his objection that the prosecutor improperly placed Appellant's failure to testify into evidence when the prosecutor elicited Proctor's testimony that Proctor did not discuss the facts of the offense with Appellant because the court had granted the defense's

request that Proctor not discuss the details of the offense with Appellant. Appellant contends that he is entitled to a new punishment hearing because the trial court committed a constitutional error that "genuinely corrupted the fact-finding process" and therefore was not harmless under Rule 44.2(a) of the Texas Rules of Appellate Procedure.

The record reflects that a defense expert, Dr. Mark Cunningham, and the State's expert, Dr. Proctor, each evaluated Appellant for mental retardation and future dangerousness. Both experts testified at trial that they had been instructed not to discuss the facts of the offense with Appellant. Appellant objected generally before trial that the State's motion for a psychological evaluation would violate his right to remain silent under Article 1, Section 10, of the Texas Constitution. However, he never specifically objected, under the state constitution or Article 38.08, to the complained-of part of Proctor's testimony. *See Roberts v. State,* 220 S.W.3d 521, 532 (Tex. Crim. App. 2007) (finding that an attack on testimony in general, advanced before any testimony was heard, did not place the trial court on notice that the appellant would find particular testimony objectionable). Therefore, Appellant did not preserve his state constitutional and Article 38.08 claims for appeal. *See* TEX. R. APP. 33.1(a); *see also Yazdchi v. State,* 428 S.W.3d 831, 844 (Tex. Crim. App. 2014). However, Appellant timely and specifically objected under the Fifth Amendment of the United States Constitution to the complained-of part of Proctor's testimony. Therefore, he preserved his federal constitutional claim.

I would reject Appellant's Fifth Amendment claim on the merits for the reasons we rejected the same claim in an unpublished opinion addressing a similar fact pattern. *See Milam v. State,* AP-76,379, slip op. at 37-41 (Tex. Crim. App. May 23, 2012) (not designated for publication). In *Milam,* we held that the trial court did not err by allowing the parties' evaluating experts to testify that they had been instructed not to discuss the facts of the offense with the appellant. We stated that such testimony did not violate the appellant's Fifth Amendment right to remain silent because the appellant constructively took the stand and waived his Fifth Amendment right to remain silent when he spoke to his own expert and introduced the expert's testimony based on that interview. *Id.* at 40 & n.79 (citing *Chamberlain v. State,* 998 S.W.2d 230, 234 (Tex. Crim. App. 1999); *Lagrone v. State,* 942 S.W.2d 602, 610-11 (Tex. Crim. App. 1997); and *Soria v. State,* 933 S.W.2d 46, 58-59 (Tex. Crim. App. 1996)). The State was then entitled to offer rebuttal testimony, limited to the issues raised by the defense expert, and to test the experts' opinions by questioning them about how they arrived at those opinions. *Id.* at 40 & n.80 (citing *Lagrone,* 942 S.W.2d at 611, and *Renteria v. State,* No. AP-74,829, slip op. at 87-89 (Tex. Crim. App. May 4, 2011) (not designated for publication)).

I would hold that, like the defendant in *Milam,* Appellant constructively took the stand and waived his Fifth Amendment right to remain silent when he spoke to his own expert and introduced testimony based on that interview. The State was then entitled to offer rebuttal

testimony and to question the experts about how they arrived at their opinions. I would overrule points of error five through seven.

## MENTAL RETARDATION

In point of error eight, Appellant asserts that the jury's adverse finding on Appellant's mental retardation special issue was so against the great weight and preponderance of the evidence as to be manifestly unjust.[10] Appellant notes that the trial court submitted the question of whether Appellant was mentally retarded as a special issue at punishment and instructed the jury that Appellant had to prove by a preponderance of the evidence that he was mentally retarded.

When the issue is presented at trial, a defendant bears the burden of proof, by a preponderance of the evidence, to establish that he is mentally retarded. *Hunter v. State,* 243 S.W.3d 664, 667 (Tex. Crim. App. 2007). In evaluating the sufficiency of the evidence to support a jury's rejection of a claim of mental retardation on direct appeal, we must consider all of the evidence relevant to the issue and evaluate whether the judgment is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Id.* We afford great deference to the jury's finding because the jury was in the best position to assess witness

---

[10] The Supreme Court in *Atkins* employed the term "mental retardation." *See Atkins v. Virginia,* 536 U.S. 304, 321 (2002). More recently, the Supreme Court has used the term "intellectual disability" to describe the identical condition. *See Hall v. Florida,* 134 S. Ct. 1986, 1990 (2014). In this opinion, I will employ the term "mental retardation" because that term is used by the parties and by the legal authorities cited herein, and it is also the term that appears in the trial record. *See, e.g., Ex parte Cathey,* 451 S.W.3d 1, 4 n.4 (Tex. Crim. App. 2014).

credibility and to resolve conflicts in the evidence. *See Williams v. State,* 270 S.W.3d 112, 114 (Tex. Crim. App. 2008).

We define mental retardation as a disability characterized by: (1) "significantly subaverage" general intellectual functioning; (2) accompanied by "related" limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18. *Hunter,* 243 S.W.3d at 666 (citing *Ex parte Briseno,* 135 S.W.3d 1, 7 (Tex. Crim. App. 2004)). In weighing evidence as indicative of mental retardation, fact finders in the criminal trial context may also focus upon other evidentiary factors. *See id.* at 666-67.

Both parties presented substantial evidence relevant to the question of whether Appellant is mentally retarded. Appellant's experts and the State's expert relied on much of the same evidence, although they reached different conclusions. Cunningham, a clinical and forensic psychologist, testified for the defense that Appellant is mildly mentally retarded. Proctor, also a clinical and forensic psychologist, testified for the State that Appellant is not mentally retarded but is within the low range of borderline intellectual functioning.

*1.     Intellectual functioning*

Significantly subaverage intellectual functioning is generally characterized by a full-scale IQ score of about 70 or below. *See Ex parte Hearn,* 310 S.W.3d 424, 428 (Tex. Crim. App. 2010) (citing the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders). There is a margin of error of approximately five points in assessing IQ. *Id.* Thus, a score may be approximately five points higher or lower than the subject's actual

IQ. *Id.* In assessing the validity of an IQ test score, fact finders may generally consider the effect of matters that could detract from the over-all validity of the score obtained, such as malingering, depression, lack of concentration, and test obsolescence, but such considerations do not warrant adding or subtracting from an IQ score. *See Ex parte Cathey,* 451 S.W.3d 1, 5 (Tex. Crim. App. 2014).

The record reflects that Appellant completed six IQ assessments from the time he was sixteen to the time of trial. In 1981, the school system evaluated him for special education placement. At that time Appellant obtained an IQ score of 65 on the Wechsler Intelligence Scale for Children – Revised ("WISC-R"). While in prison in 1991, Appellant obtained an IQ score of 73 on the Wechsler Adult Intelligence Scale-Revised ("WAIS-R"). In May 1993, again while in prison, Appellant obtained an IQ score of 76 on the WAIS-R. Appellant also completed a Beta-II test while in prison, but because it measured non-verbal abilities only, the testifying experts did not give weight to the results of that test in forming their opinions. In April 2012, while in jail awaiting trial in this case, Appellant obtained an IQ score of 73 on the Wechsler Adult Intelligence Scale Fourth Edition ("WAIS-IV"), administered by the defense's expert, Dr. James Underhill, a clinical psychologist. The State's expert, Proctor, administered another WAIS-IV on June 12, 2012, and Appellant obtained an IQ score of 72.

Both State and defense experts concluded that there was no evidence that Appellant malingered when he took the IQ tests. However, Proctor expressed concern that the IQ test he administered was the only IQ test that had been accompanied by a separate test of effort,

which was the most reliable way to know whether Appellant had given good effort during the IQ testing. Proctor acknowledged that previous test administrators did not note any concerns with Appellant's efforts and that some administrators had indicated that Appellant appeared to exert good effort during the testing. Proctor stated, however, that personal observation was not the best way to measure effort. Proctor acknowledged that Appellant gave good effort during the tests that Proctor administered.

Proctor also acknowledged that Appellant's first IQ score of 65, obtained when Appellant was sixteen years old, fell within the range of mild mental retardation. However, Proctor did not believe that this score accurately represented Appellant's level of intellectual functioning at the time of the offense and trial. Proctor attributed the variation between the 1981 score of 65 and the more recent scores either to a possible lack of effort during the first test, or to the possibility that the score accurately reflected Appellant's level of intellectual functioning in 1981, but his cognitive functioning had continued to develop and had moved beyond the range of mild mental retardation by the time of the later IQ tests. Cunningham and Proctor both testified that mild mental retardation is not necessarily a lifelong diagnosis and that a person can outgrow it or develop through it in some cases.[11]

Both State and defense experts concurred that full-scale IQ scores have a confidence interval of approximately five points, meaning that a test subject's actual IQ is somewhere

---

[11] This Court has observed the same fact, explaining that "mental retardation is not necessarily a lifelong disorder." *Ex parte Briseno*, 135 S.W.3d 1, 6 (Tex. Crim. App. 2004) (quoting AMERICAN PSYCHIATRIC ASSOCIATION DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (Text Revision, 4th ed. 2000) (DSM-IV)).

within a range that extends approximately five points below the score and five points above the score. Underhill and Cunningham testified for the defense that it was just as likely that Appellant's IQ was any number within the range as it was that Appellant's IQ was the IQ score actually obtained. Proctor, however, testified that Appellant's IQ was most likely to be the score actually obtained or one of the numbers closest to it. The further away the numbers in the range were from the score actually obtained, the less likely it was that those numbers represented Appellant's true IQ. Thus, Proctor testified, Appellant's full-scale IQ score of 72 signified a range of approximately 67 to 77, but Appellant's IQ was more likely to be 71 or 73 than to be 68 or 76.

Proctor and Cunningham concurred that the WAIS-R was normed in 1978, and so when Appellant took that test in 1991 and 1993, his scores were inflated by the Flynn effect. *See Cathey,* 451 S.W.3d at 6 n.8 (citing Alan S. Kaufman, IQ Testing 101, 203 (2009), for its explanation of the Flynn effect as the phenomenon of obsolete norms inflating IQ scores as time passes from the date an IQ test was standardized). Cunningham opined that Appellant's 1991 and 1993 scores should be adjusted downward by 0.3 points for every year that passed between the norming date and the date the test was administered. Cunningham based his opinion on the American Association on Intellectual and Developmental Disabilities's ("AAIDD's")[12] recommendation that such a revision was appropriate for an IQ score and on a similar recommendation in the WAIS-III technical manual.

---

[12] The AAIDD was formerly named the American Association on Mental Retardation.

Cunningham also noted that studies of WAIS-R scores for mildly mentally retarded subjects had found that the scores were distorted when compared with scores obtained contemporaneously from other measures of intellectual functioning. Cunningham stated that because of this problem, Professor James Flynn had written that a WAIS-R score near 70 is so defective that it "should simply be set aside because of the difficulty in understanding" what it means, but that if the score had to be used, it should be lowered by four or five points.[13] This revision would be in addition to any downward revision for the Flynn effect. Therefore, Cunningham opined, Appellant's 1991 IQ score of 73 was closer to 64 and his 1993 IQ score of 76 was closer to 66. Based on all of Appellant's IQ scores over the years, Cunningham concluded that Appellant's actual IQ was likely to be between 65 and 73. Therefore, he opined, Appellant had a disability characterized by significantly subaverage intellectual functioning.

Proctor disagreed with Cunningham's precise downward revision of the WAIS-R scores. He noted that the test publisher had acknowledged the Flynn effect but had not recommended adjusting scores according to a particular formula. Proctor stated that when the accuracy of a score is suspect, the best practice is to rely on a score obtained from a different, non-suspect, testing instrument. *See Cathey,* 451 S.W.3d at 5-6 ("The preferred solution to an outdated IQ score is not to start subtracting from that score, it is to retest with a more recently normed IQ test."). Thus, Proctor opined, Appellant's IQ is best represented by the

---

[13] This appears to be the same Professor James Flynn whom we discussed at length in *Ex parte Cathey*, 451 S.W.3d 1, 12-18 (Tex. Crim. App. 2014).

recent IQ scores obtained from the WAIS-IV. Proctor stated that the WAIS-IV was published in 2008 and therefore it was not out-of-date when it was administered in 2012, and moreover the June 2012 test was the only IQ test accompanied by a separate effort test. Thus, Proctor testified that Appellant's IQ scores of 73 and 72 were the most reliable indicators of Appellant's cognitive functioning.

Proctor testified that, based on the "practice effect," he would have expected Appellant's score on the June 2012 test to be higher than his score on the April 2012 test. Proctor noted that, while he was administering the June test to Appellant, Appellant told Proctor he was worried about the upcoming trial. Proctor observed that Appellant appeared to be somewhat distracted at times. Proctor stated it was possible that Appellant's test score was somewhat lower as a result of Appellant's being worried and distracted. Proctor did not know whether Appellant had also been worried when Underhill tested him in April 2012. Proctor stated that, based on the IQ score of 72, Appellant's true IQ is between 68 and 77, but it is most likely close to 72. Proctor opined that, although a case could be made that Appellant's IQ score placed him within the range for mild mental retardation, Appellant's level of intellectual functioning was better characterized as borderline.

Defense expert Underhill opined that the IQ score of 73 that Appellant obtained on the April 2012 WAIS-IV "could go either way." Although Underhill had not administered a separate effort test, he stated that, based on Appellant's performance on the "reliable digit span" portion of the IQ test and Underhill's personal observations of Appellant's cooperation,

mood, and demeanor during testing, Appellant had made a good effort. Underhill testified that, particularly in light of the confidence interval, this IQ score alone did not answer the question of whether Appellant's intellectual functioning was most accurately characterized as mildly mentally retarded or borderline.

2.      *Adaptive functioning*

Adaptive behavior or adaptive functioning refers to the ordinary skills that are required for people to function in their everyday lives. *Cathey,* 451 S.W.3d at 19. The determination of mental retardation in the context of a criminal trial is complicated by the problems associated with retrospective assessment and the well-known consequence of a diagnosis of mental retardation – exemption from the death penalty. *Id.* "Both experts and those answering questions about a person's adaptive functioning may exhibit significant conscious or unconscious bias in addressing this issue." *Id.* A significant impairment in adaptive behavior may be viewed as the extent to which an individual has required assistance to carry out age-appropriate activities. *Id.* at 23.

Cunningham testified that the Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition - Text Revision ("DSM-IV-TR") and the AAIDD's user's guide ("AAIDD manual") identify ten or eleven domains of adaptive functioning, depending upon whether "health and safety" is regarded as a single domain or as two separate domains.[14] Cunningham

---

[14] Cunningham identified those domains as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. *See also Atkins,* 536 U.S. at 309 n.3.

identified eleven domains, while Proctor identified ten. Cunningham testified that in recent editions of the AAIDD manual, the criteria are grouped into three categories: conceptual, social, and practical. *See, e.g., Hearn,* 310 S.W.3d at 428 & n.9. Cunningham and Proctor concurred that a person must demonstrate significant deficits in two or more domains of adaptive functioning in order to be diagnosed as mildly mentally retarded. *See, e.g., Atkins,* 536 U.S. at 309 n.3.

Cunningham testified that, on behalf of the defense, Dr. Thomas Oakland administered the Adaptive Behavior Assessment System – Second Edition ("ABAS-II") to Appellant's mother, Dorothy Hicks; sister, Jackie Griffin; brother, Willie Griffin;[15] and maternal aunt, Illian Kenon. Oakland also administered the ABAS-II to Appellant's ex-wife, Alycia Mason, and Copelyn. Cunningham testified that the results obtained from Appellant's family members varied greatly from the results obtained from Mason and Copelyn. The family members' scores ranged from 40 to 55, while Mason's and Copelyn's scores ranged from 75 to 105. To explain this disparity, Cunningham testified that it was possible that family members had underestimated Appellant's abilities because of the pending litigation, but that it was also possible that Mason and Copelyn had overestimated Appellant's abilities because they did not want to appear to have been romantically involved with a mentally retarded person.

---

[15] The ABAS-II assesses adaptive behavior by scoring answers supplied by so-called "informants"—usually those who are familiar with the subject, such as nuclear and extended family, teachers, employers, etc.—to questions designed to gauge the subject's adaptive abilities. I will refer to members of the Griffin family by their first names.

Cunningham also acknowledged that Hicks and Kenon had answered the questions based on their recollections of Appellant's functioning as a seventeen-year-old, which was problematic because adaptive behavior instruments are not meant to be completed retrospectively, and Appellant was about forty-six years old when the ABAS-II was administered. Therefore, Cunningham did not place much weight on the ABAS-II scores but instead relied primarily on witness interviews and records.

Cunningham testified that he assessed Appellant's adaptive functioning by reviewing available records of Appellant's academic history and other records that he deemed informative of Appellant's ability to function in the community. Cunningham also administered the Wide Range Achievement Test 4 ("WRAT-IV"), which he described as a test of functional academic literacy and capability, and the Reynolds Intellectual Assessment System ("RIAS"), which he described as being similar to an IQ test. Cunningham interviewed Appellant for five hours. He also interviewed Copelyn; Hicks; Jackie; Willie; Appellant's former neighbors, Pat and Nancy Roman; and Appellant's former employer, Eddie Smith.

Proctor testified that he did not administer the ABAS-II because he could not find a reliable historian who had recent, frequent contact with Appellant. He opined that the scores Oakland obtained from Appellant's family members were too low to be consistent with mild mental retardation; they were more consistent with severe or moderate mental retardation. Proctor did not think that the ratings Copelyn provided to Oakland were inflated, but he thought that they were problematic because Appellant had been in jail for approximately two

years when Copelyn provided them. Therefore, like Cunningham, Proctor assessed Appellant's adaptive functioning based on witness interviews and records rather than scores on an adaptive functioning inventory.

In preparing his report concerning Appellant's adaptive functioning, Proctor interviewed fourteen people, including the seven people Cunningham had interviewed. Proctor did not give any weight to his interviews with Hicks, Jackie, and Willie. Proctor stated that when he interviewed them, it was apparent that they had already decided what they wanted to tell him. They provided narrative accounts about Appellant's abilities and deficits, but they would not answer Proctor's questions. Hicks and Jackie would change the subject rather than answer a question directly. Willie ended the conversation when Proctor began to ask him questions.

Proctor gave more weight to his interview with Copelyn. Proctor opined that Copelyn gave a "fairly balanced" impression of Appellant. She was willing to acknowledge Appellant's deficits, and she did not say implausible things or overemphasize Appellant's strengths.

Cunningham identified four domains of adaptive functioning in which Appellant had significant deficits: functional academic skills, work, self-direction, and social interpersonal relationships. With respect to Appellant's functional academic skills, Cunningham opined that Appellant's WRAT-IV and RIAS scores were consistent with mild mental retardation. Cunningham noted that the RIAS was twelve years old when he administered it to Appellant

in 2012. Therefore, he opined, the score of 74 should be lowered to account for the Flynn effect.[16] Cunningham also noted that Appellant went through adaptive functioning testing when he was sixteen. Appellant's scores from the WRAT administered in 1981 reflected that Appellant was reading at a 5.4 grade level. He was spelling at a 3.9 grade level. His math skills were at a 3.9 grade level. Cunningham stated that these test results led the school to classify Appellant as "educable mentally handicapped," a term formerly used by school systems that was equivalent to the term "mildly mentally retarded."

The prison administered the WRAT-R to Appellant in 1993. Cunningham stated that the results reflected that Appellant was reading at a third grade level. His spelling was below a third grade level. His math skills were at a fifth grade level. Regarding the WRAT-IV that Cunningham administered on June 10, 2012, Appellant's word reading, sentence comprehension, and composite reading were at a 5.5 grade level. His spelling was at a 4.7 grade level. His math skills were at a 5.9 grade level. Cunningham opined that Appellant's approximately fifth grade achievement level was consistent with mild mental retardation.

Cunningham also considered records from classes that Appellant had taken as an adult while in prison and records from a Commercial Drivers License ("CDL") course that Appellant took in 2009. Appellant had to take the CDL course more than once and he had to take parts of the CDL test multiple times before he passed. From this information,

---

[16] In *Ex parte Cathey*, 451 S.W.3d at 18, we specifically determined that, in assessing mental retardation for purposes of determining immunity from execution in Texas, the Flynn Effect may be considered, but IQ scores themselves "may not be changed."

Cunningham concluded that Appellant has a significant deficit in the domain of functional academics.

Proctor also administered the WRAT-IV and the RIAS to Appellant. The WRAT-IV results reflected that Appellant was reading at a 5.4 grade level; his sentence comprehension and composite reading were at a 5.5 grade level; his spelling was at a 5.9 grade level; and his math skills were at a 7.4 grade level. Proctor stated that these scores were similar to the results that Cunningham reported. However, Proctor interpreted these scores as well as Cunningham's scores as being consistent with borderline intellectual functioning rather than mild mental retardation.

Proctor also reviewed the results of the 1981 adaptive functioning instrument completed by Appellant's teacher and mother. He did not perceive that those results warranted classifying Appellant as "educable mentally handicapped." He noted that all of Appellant's teacher's ratings for various areas of adaptive functioning placed Appellant's functioning around the thirtieth percentile and all but one of Appellant's mother's ratings placed Appellant "well above" the second percentile that would have been consistent with a finding of mild mental retardation. Proctor stated that although the school had determined from these ratings that "there were areas of deficit," these scores were not "at the low level that [Proctor] expected" for someone who was "ultimately labeled as being educable mentally handicapped."

Proctor acknowledged that Appellant's 1991 prison records contained a clinical note stating that Appellant's "level of adaptive functioning is questionable and may need to be further evaluated," and Appellant was referred for an evaluation. However, Appellant was not placed into a Mental Health/Mental Retardation ("MHMR") program in prison and was not on MHMR caseloads while he was on parole and probation. Appellant's former probation officer testified that Appellant was not on the MHMR caseload because Appellant did not meet the criteria for mental illness and did not have an IQ score below 70.

Proctor spent eleven hours with Appellant at the jail. When they first met, Proctor handed Appellant a form explaining why Proctor was meeting with him and what Proctor hoped to accomplish. Appellant appeared to read the form, and when Proctor discussed it with him, Appellant seemed to understand it. Proctor also noted that, while in jail, Appellant read and wrote letters. Appellant accurately described to Proctor a story that he had read in the newspaper. Proctor concluded that Appellant did not have a significant deficit in the domain of functional academic skills.

Lay witnesses provided additional testimony relevant to Appellant's functional academic skills. Copelyn testified about Appellant's efforts to obtain a CDL, stating that Appellant studied very hard for the course but had trouble with some parts of it. She helped him with the chapter concerning air brakes. They reviewed that chapter so many times that Copelyn grew frustrated with Appellant. Appellant had a hard time retaining the information,

but he really wanted to get through it. Appellant had to take the air brakes portion of the CDL test, which involved mathematical calculations, two or three times before he passed it.

Copelyn testified that Appellant was able to text her using a mobile telephone. If they went out to a restaurant, Appellant could calculate the tip and pay the bill without help. Copelyn also testified that Appellant watched the game show, *Wheel of Fortune,* with her. Sometimes he solved the puzzles faster than the contestants, but sometimes he came up with crazy guesses. When that happened, Copelyn could not tell if Appellant thought he had the right answer or if he was just being funny. Copelyn observed Appellant reading the Bible. When Copelyn read the book, Angela's Ashes, Appellant also read it and discussed it with her. Copelyn clarified that Appellant "worked his way through it." In addition, Appellant read the newspaper every morning while they lived together. He wrote to Copelyn every day from jail and she wrote back. Copelyn acknowledged that Appellant was capable of doing things when he put his mind to them, but he often chose not to.

Elizabeth Farmer testified that she had been a special needs teacher at Appellant's high school in 1981, when Appellant was placed in the educable mentally handicapped program. Farmer had written Appellant's Individual Education Plan ("IEP") because she was his home room teacher. Appellant's school records contained grades ranging from 32 to the 80s. The records included a note that Appellant was failing science because of ten unexcused absences.

Farmer acknowledged that Appellant's 1981 social assessment contained a notation that Appellant had a history of academic failure compounded by his general apathy and

apparent lack of ambition. She also acknowledged that a school social worker had noted in Appellant's records that his performance on the adaptive behavior scale was impaired by his lack of interest. Another teacher described Appellant as a child who did not care or take interest in anything. Appellant's family members reported to the school that Appellant was lazy, grumbled about working, and occasionally threw a tantrum when he did not get his way. Appellant's mother reported that he had no ambition or aspirations and that he lied frequently but not always effectively. Following Appellant's placement into the educable mentally handicapped program, Appellant passed some of his special needs classes. Farmer pointed out that the work was much simpler in those classes than in the typical classes.

Concerning the domain of work, Dr. Cunningham testified that Appellant's employers described him as having limited abilities, deficient conceptual understanding, impaired skill acquisition, and poor self-direction or initiative. For example, Eddie Smith, who had hired Appellant to help him clear land, told Cunningham that Appellant could not learn to use a chain saw. Appellant was good with simple tasks, but Smith had to check on Appellant's progress periodically. If Smith told Appellant to complete several tasks, Appellant would complete the first task and then stop until Smith reminded him what to do. Cunningham testified that Smith continued to give Appellant work several days a month because Appellant was friendly and made an effort.

Cunningham testified that Pat Roman, Appellant's neighbor, was a plumber who sometimes hired Appellant to help him. Roman described Appellant as "a strong back and

a weak mind." Roman tried to teach Appellant to do simple plumbing repairs, but Appellant could not learn. If Appellant did a job wrong and Roman corrected him, Appellant would fix the mistake, but the next time Appellant did the job, he would make the same mistake again. Roman commented that Appellant was mostly helpful with lifting things.

Cunningham stated that Roman reported that he once gave Appellant a job application for a Denny's restaurant, but Appellant could not fill it out. Further, Appellant seemed intimidated by the job description. Roman also recalled that Appellant could not assemble a basketball goal without help. Roman told Cunningham that Appellant could follow instructions, but he sometimes seemed vague or unfocused. Appellant was not sensitive to social cues and could not tell when Roman wanted to be alone. Roman stated that Appellant was generally respectful and friendly, but he could be argumentative and easily frustrated when they worked together.

Cunningham also testified that Appellant's brother, Willie, sometimes hired Appellant to work with him clearing land. Willie told Cunningham that Appellant had no understanding of the job and no common sense about danger. For example, Appellant would walk under a tree while it was being cut down, apparently unaware that it might fall on him. Willie would not allow Appellant to use power tools because Appellant would hold them dangerously or ruin them.

Willie reported to Cunningham that Appellant needed direct and immediate instructions to move from one task to the next. Appellant could sometimes do a good job with

a simple, repetitive task. However, Willie told Cunningham that his own eleven-year-old son could do a better job of smoothing sand than Appellant did; Appellant was more like a six-to-eight-year-old child on the job.

Copelyn also told Cunningham that Appellant had trouble getting and keeping a job. When Appellant lost a job, he would give her an implausible explanation, such as saying that he was fired because the boss did not like him chewing gum. Copelyn observed that Appellant did his best work when he had a concrete task, limited co-worker interaction, and clear direction, such as yard work-type jobs.

Cunningham opined that Appellant's employment records were consistent with the observations of the people he interviewed. For example, records from a job that Appellant briefly held at a chicken processing plant showed that Appellant was written up several times for working too slowly. Appellant's employment records reflected many short-term employments, a recurrent inability to work with others, excessive tardiness, absenteeism, and poor job performance. Cunningham noted that Appellant needed a job but did not behave in ways that would help him get and keep a job.

Cunningham acknowledged that, for a person with a higher IQ, these types of behaviors might be characteristic of a personality disorder. He opined, however, that when a person with an IQ of 70 exhibited such behavior, the behavior was characteristic of intellectual disabilities because the person was not capable of better performance. Cunningham stated that age and IQ were critical factors in determining the meaning of these

behaviors. Cunningham concluded that Appellant showed substantial deficits in the domain of work related to his subaverage intellectual functioning.

Proctor interviewed the same former employers that Cunningham did. Proctor also interviewed John Ellis, Appellant's former supervisor at a bread company. Unlike Cunningham, Proctor did not rely on what Appellant's brother Willie told him about Appellant's work because Proctor did not view Willie as a reliable historian.

Proctor's interviews with Smith and Roman led him to form a different impression than Cunningham had formed. Smith told Proctor that Appellant could not use heavy machinery and had to be reminded to start each separate task, but Smith also stated that Appellant could complete manual labor tasks satisfactorily, was reliable, showed up on time, and did the work. Smith hired Appellant because Smith needed the work done and Appellant could do it. When Proctor asked Smith if he thought that Appellant could perform that type of work on a regular basis, Smith stated that he thought that Appellant could probably work long-term in a setting such as a ranch where there was an ongoing need for someone to clear and maintain the property.

Roman told Proctor that he had problems with Appellant's work, but Roman also acknowledged that he did not have much patience. Further, Appellant's inability to do the work to Roman's satisfaction was only one of the reasons that Roman quit using him. Roman told Proctor that he stopped working with Appellant because Appellant wanted Roman to split the money fifty-fifty with him and Appellant wanted Roman to help him with the jobs that

Roman had hired Appellant to do, such as carrying supplies and digging. Proctor did not think that Appellant's inability to pick up plumbing-related tasks right away or the fact that Roman became impatient with Appellant signaled significant adaptive deficits.

Ellis told Proctor that he had supervised Appellant in the warehouse of the bread company for a total of two years. Ellis described Appellant as a good and valuable employee. He described the work that Appellant did and stated that Appellant did it well. However, Appellant had problems getting along with his co-workers.

Proctor opined that Appellant's problems in the work domain were not necessarily related to subaverage intellectual functioning. Proctor pointed out that Appellant had spent much of his adult life in prison, which hindered his ability to acquire work experience and obtain jobs. Appellant also had a special education diploma, which might make it hard to obtain jobs. Despite these obstacles, Appellant had obtained numerous jobs, although he was not able to keep many of them for very long. Appellant's employment records reflected a pattern of conflicts and arguments. Proctor concluded that Appellant did not have significant deficits in the work domain. To the extent that Appellant had trouble holding a job, Proctor opined that this trouble was related to Appellant's personality.

Lay witnesses provided additional testimony relevant to Appellant's ability to function at work. Ellis testified that Appellant's primary job at the bread company was to receive a truckload of fifty types of bread products and then sort the products for distribution to stores and restaurants along seven delivery routes. Appellant sorted the products according to a

chart that indicated how much of each product needed to go on each route. The chart varied daily. Ellis stated that Appellant was efficient, timely, and did not make mistakes.

Appellant's job at the bread company also included keeping the warehouse clean. Ellis noted that Appellant kept the warehouse "immaculate." Ellis commented that Appellant sometimes performed above and beyond the job expectations, taking initiative and doing the tasks that he saw needed to be done. This was especially true with respect to cleaning. Appellant swept and pressure-washed the warehouse. Ellis acknowledged that Appellant generally worked by himself and the job was relatively repetitive.

After Appellant had worked at the bread company for about a year and a half, Ellis fired him because of interpersonal conflicts. Appellant had begun "bossing" and arguing with other employees, including Ellis. However, about six months after firing Appellant, Ellis rehired him because Ellis had not been able to find anyone else who could do the job as well as Appellant. Appellant promised that he would control himself and get along with his co-workers. Appellant kept his promise, and Ellis was satisfied with Appellant's work. Appellant was friendly and a good conversationalist. Appellant left the job after six months because he was jailed after committing a criminal offense.

Copelyn testified that she sometimes accompanied Appellant on his job at the bread company. She observed that Appellant's work of sorting the products into bins and getting the bins onto the right trucks was complicated, but Appellant did it well and quickly. Copelyn stated that she did not think that she would have been able do the job as well as Appellant did.

Appellant's friend, Bruce Leggett, testified that Appellant had acknowledged that he had lost jobs because he would not back down in a confrontation. Leggett also testified that Appellant was not mechanically inclined. Leggett suspected that Appellant had trouble reading, based on Appellant's inability to follow instructions for setting up musical equipment.

Marshell Robinson testified that she worked with Work Force Solutions, an organization that helps people obtain training and find jobs, and that she had helped Appellant. In October 2009, Appellant went to Robinson's office and told her that he was interested in becoming a professional truck driver. Work Force approved Appellant for training. In exchange for receiving help from Work Force, Appellant agreed to comply with conditions such as calling in regularly and completing paperwork to verify that he was looking for a job. Work Force paid for Appellant's CDL course and provided him with money for transportation. Appellant had trouble completing the CDL tests and had to take the course twice, but eventually he obtained his CDL.

After Appellant obtained his license, however, he stopped calling in regularly. He never provided Robinson with any job search documentation. Robinson notified Appellant of job fairs and job openings. She gave Appellant twenty job referrals, but Appellant never followed up. He gave Robinson excuses for postponing the application process, or he stated that he did not want the jobs that were available. One time, Appellant was offered a job as a truck driver, but he did not accept the job because he would have to be gone overnight.

Another time when Robinson called Appellant about a job opening, he told her that the company could call him if they wanted him. Work Force eventually terminated Appellant from the program in August 2010. Robinson testified that, on September 17, 2010, Appellant was notified that he had lost a food stamp benefit because he was not participating in the program as required and that he would not be eligible to re-apply for six months.

Concerning the self-direction domain, Dr. Cunningham observed that Appellant had never lived on his own. He was always supported emotionally and financially by the women with whom he lived. Cunningham noted that Appellant collapsed functionally and emotionally when Copelyn stopped living with him. Cunningham opined that Appellant's act of locking himself in Copelyn's car was a very childlike way to try to get her to "not break ties" and to take him home. Appellant's sister, Jackie, told Cunningham that Appellant was easy to manipulate. He craved approval and would try hard to get it. Jackie stated that Appellant could not follow a series of tasks; he had to be told one task at a time. When Appellant went out to run an errand, he would have to call home because he would forget what the errand was. Jackie reported to Cunningham that Appellant was easily frustrated and could not problem-solve.

Copelyn reported to Cunningham that she managed the household and was responsible for the budgeting, bills, and parenting. She stated that she could send Appellant to the store for a few items, but she could not send him to shop independently for the week's groceries. Cunningham opined that Copelyn's narrative account of Appellant's abilities was inconsistent

with the conceptual and practical ratings she had provided on the ABAS-II, which placed Appellant in the "normal" range.

Cunningham testified that Copelyn told him that if Appellant had a job, he would go to it, but that Appellant took little initiative in finding a job. Cunningham opined that it was consistent with mild mental retardation to lack initiative, be apathetic, and "just sit" as opposed to engaging actively with the environment. Copelyn told Cunningham that Appellant would contribute money to a bill if the bill arrived on payday, but he could not think ahead about saving money and was apt to spend his entire paycheck in one night. He was oblivious to due dates. For example, he would not pay a telephone bill until the service was cut off. Copelyn told Cunningham that Appellant's family took advantage of him. For example, Willie would hire Appellant to do a job, but then pay him less than promised. Appellant's mother was always asking everyone for money, and Appellant would give her whatever money he had. Cunningham concluded that Appellant had substantial deficits in the area of self-direction.

Proctor opined that Appellant's deficits in the self-direction domain were not significant. Appellant could make decisions and follow them through. Proctor learned from Copelyn that Appellant was very good about performing household duties on his own. Appellant drove Copelyn's car and took Copelyn to and from work every day. Appellant also taught Copelyn's son to drive a manual transmission. Appellant's neighbor, Pat Roman, told

Proctor that Appellant kept his yard very clean. Appellant won an award from the city because his yard was so well-maintained.

Lay witnesses provided additional testimony relevant to Appellant's self-direction and social interpersonal functioning. For example, Copelyn testified that when Appellant lived with her, he washed and ironed clothes and kept the house "immaculate." He also grilled and cooked food. He prepared balanced meals. He baked cookies and cakes from box mixes. Similarly, Copelyn's friend, Christina Camp, testified that while Appellant was a guest in her house, he was "very clean" and helped with the groceries and cooking. Appellant's former girlfriend, Charisma Green, recalled that Appellant was a good cook and could handle money.

Leggett testified that when he first met Appellant through Copelyn, Appellant was fairly quiet but also a good conversationalist. Appellant seemed genuinely interested in what Leggett had to say, and he responded appropriately. After they had known each other for a couple of months, Appellant would call Leggett on the telephone to talk or to ask him if he wanted to go fishing. They would see each other two or three times a week. Appellant would go out to watch Leggett's band perform and they would go fishing together.

Leggett stated that he sometimes called Appellant on the telephone following arguments with his wife. Leggett explained that he and his wife went through a period of arguing more than usual because Leggett was "on a short fuse" following his service in Iraq and he and his wife had recently lost a child. When Leggett called Appellant, Appellant would go to Leggett's house to help calm him down and remove him from the situation.

Appellant counseled Leggett not to lose his temper or "risk a domestic violence situation" that could get him into legal trouble and jeopardize his family and livelihood.

Leggett testified that Appellant had a good relationship with Leggett's children. Appellant sometimes babysat them or took them fishing and they were happy to spend time with him. Leggett also testified that Appellant had a good relationship with Janiesha, who was the youngest daughter of Appellant's sister, Jackie. Appellant took Janiesha to father-daughter functions at her school and sometimes he picked her up from Jackie's house on the weekends. Copelyn testified that Appellant maintained a good relationship with Jackie because he wanted to see Janiesha, and he took good care of Janiesha when she visited them.

In addition, Copelyn and Leggett each testified that they trusted Appellant to babysit their children. They thought that Appellant would be able to handle an emergency situation if anything went wrong while he was taking care of the children.

Appellant's former employer, Smith, testified that his two grandchildren were very fond of Appellant. They would stay outside and talk with Appellant while he worked on Smith's property. Once when the children's parents were unable to attend a school function, Appellant attended instead.

Appellant's former neighbor, Kim Galindo, testified that she met Appellant when they lived in the same apartment complex in 2004 or 2005. At that time, Galindo and Appellant were both around forty years old. Galindo was in graduate school. Galindo never went to Appellant's apartment, but she understood that Appellant was living with his girlfriend.

Galindo would see Appellant outside and they chatted as neighbors. They occasionally took walks or went to a coffee shop together. These outings were generally spur-of-the-moment; Galindo would see Appellant and invite him to join her. Sometimes Galindo's graduate student friends would join them. If Galindo and her friends discussed international politics or their dissertation research, Appellant would "sit back quietly" because those conversations went over his head. Galindo testified that Appellant was easy to talk to, but they conversed about only a few subjects. They usually talked about what was going on in their lives.

Galindo testified that she continued to see Appellant occasionally at the coffee shop after he left the apartment complex and moved in with a new girlfriend. Appellant talked to Galindo about problems he had getting along with his girlfriend's children. Galindo once told him that he needed to control his temper with his girlfriend. Appellant responded "like a reprimanded child"; he agreed that he needed to work on controlling his temper and he did not try to defend himself.

Galindo testified that she never saw Appellant lose his temper, but she acknowledged that she never saw him in a situation where he was provoked. In addition, she never saw Appellant take on a leadership role; he would go along with whatever she wanted to do. Galindo observed that Appellant was able to handle himself socially, but he always lived with a girlfriend who "helped him out." Galindo was not sure whether Appellant was capable of living independently. He seemed to rely on others for direction; Galindo once helped him get

a short-term job distributing flyers. Galindo received a few letters from Appellant after she completed her graduate work and left College Station in 2007.

Concerning the social interpersonal domain, Dr. Cunningham noted that Appellant was "competitive with" Copelyn's children. He acted like "another kid in the house." He did not mind if Copelyn spent money on herself, but he did not want her to spend money on her kids. Appellant was possessive, insisted on accompanying Copelyn everywhere, and expressed abandonment anxiety. Appellant seemed unaware that his clingy behavior was likely to drive Copelyn away. Copelyn reported to Cunningham that when Appellant was frustrated with her or one of the children at home, he would sit in front of whoever he was mad at and yell continuously for four to five hours, saying the same thing over and over again. Cunningham opined that this behavior indicated a failure in self control and emotional regulation, an inability to read feedback, and an inability to foresee that such behavior was likely to drive others away.

Cunningham testified that Appellant's employment records also reflected recurrent interpersonal conflicts. Appellant's criminal records likewise reflected a recurrent difficulty in dealing with anxiety, frustration, and conflict in romantic and step-family relationships. Appellant's prison and jail records also reflected interpersonal difficulties with other inmates and staff. Specifically, these records reflected that Appellant was sometimes obstinate, argumentative, and bullying.

Cunningham acknowledged that, for a person with a higher IQ, this type of behavior could be consistent with a pathological condition. However, he opined that for a person with an IQ of 70 who also exhibited other adaptive deficits, this behavior was less likely to be the result of a disturbed personality and more likely to be the product of intellectual limitations. Therefore, he concluded, Appellant demonstrated significant or substantial deficits in the social interpersonal domain that were related to his subaverage intellectual functioning.

On the other hand, Proctor testified that Appellant's functioning in the domain of social interpersonal skills was a "mixed bag." He noted that Appellant had a lot of friends and was outgoing, but that Appellant also had a history of disagreements and arguments with people. In light of Appellant's strengths in this domain, Proctor did not believe that Appellant's social interpersonal problems were significant. Further, Proctor opined that Appellant's problems were associated with personality issues, such as being controlling and demanding. Therefore, Proctor did not conclude that Appellant had significant deficits in this domain related to subaverage intellectual functioning.

3.    *Onset prior to eighteen*

The record reflects that in 1981, when he was sixteen years old, Appellant obtained an IQ score of 65 on the WISC-R and was classified as "educable mentally handicapped" – a term that both Cunningham and Proctor described as equivalent to the term "mild mental retardation." However, Proctor did not believe that a diagnosis of mild mental retardation was appropriate at the time of the offense. Cunningham and Proctor both testified that mild

mental retardation is not necessarily a lifelong diagnosis and that a person can outgrow it or develop through it in some cases. In addition, Proctor did not perceive that the results of the adaptive functioning testing administered in 1981 placed Appellant within the range of mental retardation, and he interpreted Appellant's academic functioning as being consistent with borderline intellectual functioning.

4.      *Briseno factors*

"There are other evidentiary factors which fact-finders in the criminal trial context might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder." *See Briseno,* 135 S.W.3d at 8-9.[17]   Cunningham and Proctor both

---

[17]  These factors are:

> Did those who knew the person best during the developmental stage – his family, friends, teachers, employers, authorities – think he was mentally retarded at that time, and, if so, act in accordance with that determination?

> Has the person formulated plans and carried them through or is his conduct impulsive?

> Does his conduct show leadership or does it show that he is led around by others?

> Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

> Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

> Can the person hide facts or lie effectively in his own or others' interests?

> Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*See Williams,* 270 S.W.3d at 114 (citing *Briseno,* 135 S.W.3d at 8).

testified that these other factors are not part of the clinical diagnosis of mental retardation within the professional scientific community but that they may be considered by the fact finder in the criminal trial context. *See, e.g., Sosa,* 364 S.W.3d at 892 ("While we did not make consideration of any or all of these factors mandatory, they reflected our concern that the AAIDD's guidelines should not be considered in isolation, but rather in the context of the concerns expressed by the Supreme Court in *Atkins*.").

Cunningham noted that during Appellant's developmental period, Appellant was diagnosed as mildly mentally retarded and placed into special education classes. Cunningham also stated that Appellant's plans since he reached adulthood were "extraordinarily poorly formulated and reflect[ed] . . . judgment impulsivity." Cunningham noted that no one ever described Appellant as a leader. Appellant might be a bully on occasion, but that was not the same as being a leader. Appellant did not lead anyone; he required a high degree of structure and instruction from other people. Cunningham stated that Appellant's sister, Jackie, described him as gullible and easily manipulated. Proctor disagreed with this description. Based on his interactions with Appellant, Proctor opined that Appellant was skeptical and guarded.

Cunningham testified that Appellant was easily frustrated and engaged in recurrently irrational and inappropriate conduct toward employers, Copelyn, and her children. Cunningham noted that when he questioned Appellant, Appellant's initial responses would be on point, but then Appellant would wander into unrelated matters until Cunningham

redirected him back to the topic. Cunningham also observed that Appellant did not effectively hide facts or lie. For example, Appellant gave Copelyn implausible reasons for losing jobs—he lied, but not effectively.

Cunningham opined that Appellant's conduct during the instant offense strongly suggested impulsivity, poor planning, and clumsy execution of purpose. Appellant had a witness drop him off at the victim's apartment complex, he had no weapon, and he apparently did not anticipate Cameron's interruption (although he previously had seen Cameron with Jennifer at the clinic). He did not succeed in killing Cameron.

Similarly, Cunningham opined that Appellant's efforts to get rid of evidence were ineffective. Appellant left his cap and footprint at the scene. Appellant threw the trowel with Cameron's blood on it into a trash can near the victim's apartment. He washed his clothes but left blood on his shoes. He was still wearing shoes with blood on them when he was arrested the next day. After law enforcement officers knocked on the front door of his mother's house, Appellant looked out the front window and disturbed the curtains. Then he hid in the bathroom, where officers found him. Appellant confessed to the offense within approximately twenty-four hours of his arrest.

Based on Appellant's IQ test results, adaptive deficits, and classification of "educable mentally handicapped" at the age of sixteen, Cunningham concluded that Appellant is mildly mentally retarded and therefore ineligible for the death penalty. Cunningham testified that the other factors identified by this Court in *Briseno* supported this conclusion.

Unlike Cunningham, Proctor concluded that Appellant does not have significant adaptive deficits in any domain. Proctor found evidence of a personality disorder, not otherwise specified, with antisocial and paranoid personality traits. Proctor testified that there is evidence that Appellant meets each of the DSM-IV's diagnostic criteria for antisocial personality disorder.[18] *See also Briseno,* 135 S.W.3d at 13 n.52. Proctor concluded that Appellant's adaptive deficits arise from Appellant's personality as well as his borderline intellectual functioning.

Dr. Jolie Brams, a clinical psychologist, testified for the defense that Proctor incorrectly attributed Appellant's adaptive deficits to personality issues. Brams stated that a person who is intellectually deficient has oddities of functioning that mimic a personality disorder but that actually reflect the person's delayed or deficient intellectual functioning. She noted that "one of the hallmarks of intellectual deficiency are difficult, problematic interpersonal relationships." The reason for such problems is that an adult with an intellectual deficiency does not possess the same communication skills, problem solving skills, judgment, confidence, and maturity as other adults. Therefore, Brams concluded, Appellant's adaptive

---

[18] Proctor identified these criteria: (1) failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest; (2) deceitfulness as indicated by repeated lying, use of aliases or conning others for personal profit or pleasure; (3) impulsivity or failure to plan ahead; (4) irritability and aggressiveness as indicated by repeated physical fights or assaults; (5) reckless disregard for safety of self or others; (6) consistent irresponsibility as indicated by repeated failure to sustain consistent work behavior or honor financial obligations; and (7) lack of remorse as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.

deficits were fully consistent with subaverage intellectual functioning and it was improper to attribute them to a personality disorder.

Lay witnesses provided additional testimony regarding whether Appellant's adaptive functioning was indicative of mental retardation. *See Briseno,* 135 S.W.3d at 8. For example, Jodi Piacente testified that she met Appellant through her boyfriend in 1990, when they lived in the same apartment complex. Piacente's boyfriend knew Appellant because Appellant was the apartment complex's "drug guy" who supplied him with marijuana. One night, Appellant broke into Piacente's apartment. He tackled Piacente in her living room and tried to break her neck, but she escaped when Appellant became distracted by her seven-year-old son walking in and asking Appellant why he was trying to kill his mommy. As a result of this incident, Appellant was convicted of burglary. The prosecutor in the instant case argued that Appellant had learned from this incident that he should not leave witnesses who could testify against him.

Green, Appellant's former girlfriend, testified that she met Appellant in late 2005, when his mother lived in Green's apartment complex. Initially, Appellant seemed nice and outgoing. They were friends for a couple of months before Appellant moved in with Green. They used crack cocaine together. Appellant physically abused Green's four-year-old daughter and would push Green away if she tried to intervene. After a month or two of such abuse, Green sent her daughter to live with her paternal grandmother. Appellant also hit and

pushed Green. Appellant left Green in February 2007 when the lights in her apartment "got turned off."

Copelyn testified that she was unaware that Appellant had been living with another girlfriend before he moved in with Copelyn in 2007. If Appellant was using illegal drugs during that time, he successfully hid that fact from Copelyn. Copelyn acknowledged that Appellant lied to her about the facts of his previous offense, and that he still had not told her the real facts of that offense. Copelyn also acknowledged that Appellant persuaded her "for a while" that he was not involved in the instant offense. She testified that Appellant had called her after her first day of testimony in the instant trial, ostensibly to see how she was doing. Copelyn stated that Appellant "could sweet talk anyone"; he could be very manipulative when he wanted something.

To summarize, the trial record contains substantial evidence that Appellant is mildly mentally retarded, but it also contains substantial evidence that Appellant is not mentally retarded. Under these circumstances, we defer to the fact finder. *See Williams,* 270 S.W.3d at 114; *Briseno,* 135 S.W.3d at 9. Based on Appellant's 2012 IQ scores and witnesses' testimony about his adaptive functioning as an adult, the jury could have reasonably found that Appellant's IQ score of 65 and "educable mentally handicapped" classification in 1981 did not accurately reflect Appellant's cognitive and adaptive functioning at the time of the offense in 2010. *Cf. Cathey,* 451 S.W.3d at 19 (noting that the relevant consideration for Eighth Amendment purposes is whether a person was mentally retarded during the

developmental period and at the time of the offense).  In addition, the jury reasonably could have found that any deficits in Appellant's adaptive behavior were related to his personality and not necessarily to subaverage intellectual functioning.  The jury was in the best position to make credibility determinations and evaluate conflicting evidence. *See Hunter,* 243 S.W.3d at 671-72.  On this record, the jury's finding that Appellant is not mentally retarded is not so against the great weight and preponderance of the evidence as to be manifestly unjust.  I would overrule Appellant's eighth point of error.

## MENTAL RETARDATION SPECIAL ISSUE

In point of error nine, Appellant asserts that the trial court erred by instructing the jury that, in deliberating on the mental retardation special issue, the jury "shall consider all the evidence admitted at both" phases of the trial, including evidence of Appellant's background, character, or the circumstances of the offense that militate for or mitigate against the imposition of the death penalty.  Appellant acknowledges that he did not object to this instruction.  He argues, however, that the instruction constitutes egregious error because it tells jurors that they may view the evidence proving Appellant's subaverage intellectual functioning as evidence that militates in favor of the death penalty.  Appellant argues that, by informing the jury that it may consider evidence of mental retardation as evidence militating for the death penalty, this instruction "runs afoul of the gist of the United States Supreme Court['s] ruling in *Atkins,*" and violates Appellant's rights under the Eighth and Fourteenth Amendments.

Because Appellant failed to timely object to the instructions submitted to the jury, he must establish that these instructions were erroneous and that they "egregiously harmed" him. *See Williams,* 270 S.W.3d at 133. Harm is egregious if it deprives the Appellant of a fair and impartial trial. *Neal v. State,* 256 S.W.3d 264, 278 (Tex. Crim. App. 2008). The degree of harm must be assayed in light of the entire jury charge; the state of the evidence, including the contested issues and weight of probative evidence; the argument of counsel; and any other relevant information revealed by the record of the trial as a whole. *See Warner v. State,* 245 S.W.3d 458, 461 (Tex. Crim. App. 2008) (citing *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)).

In this case, the entire jury charge concerning mental retardation was as follows:

The Defendant must prove Special Issue No. 3 submitted to you by a preponderance of the evidence, and you shall return a Special Verdict of "YES" or "NO" on Special Issue No. [3].

"Preponderance of the evidence" means the greater weight and degree of credible evidence, including testimony, that has been introduced in this case.

Special Issue No. 3 asks: "Is the Defendant mentally retarded as that term is defined herein."

"Mental retardation" is defined as a disability characterized by: (1) significant subaverage general intellectual functioning; (2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18.

"Sub-average general intellectual functioning" refers to measured intelligence on standardized psychometric instruments of two or more standard deviations below the age-group mean for the tests used.

"Adaptive behavior" means the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group.

In deliberating on Special Issue No. 3, you shall consider all the evidence admitted at both the guilt or innocence phase of the trial and the punishment phase of the trial, including evidence of the defendant's background, character, or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

You may not answer Special Issue No. 3 "YES" unless you agree unanimously.

You may not answer Special Issue No. 3 "NO" unless you agree unanimously.

You are further instructed that you are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling in considering all of the evidence before you and in answering Special Issue No. 3.

Special Issue Number 3 on the verdict form asked, "Do you find from a preponderance of the evidence that the Defendant is mentally retarded as that term is defined herein?" The jury unanimously answered this special issue in the negative.

Assuming *arguendo* that the complained-of portion of the jury instruction was erroneous,[19] it did not egregiously harm Appellant. The state of the evidence relevant to this

_____

[19] Article 37.071, Section 2(d)(1), explicitly requires the trial court to give an instruction to the jury that, "*in deliberating on the issues submitted under Subsection (b) of this article*, it shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty[.]" (Emphasis added.) But nowhere does Article 37.071 itself explicitly authorize an instruction with respect to mental retardation *at all*, much less does it require the trial court to instruct the jury to consider all guilt and punishment stage evidence in making the mental retardation determination. This is not necessarily to say that a trial court would err to give such an instruction as part of an extra-statutory, constitutionally required mental retardation special issue instruction. I would not decide that question today. I would remark only that such an instruction, if it is required, would best be tailored explicitly to the mental retardation issue, such that it directed the jury to consider all evidence from both stages

issue, including the contested issues and weight of probative evidence, is described in point of error eight. Appellant received a full and fair hearing of his mental retardation claim. *See Williams*, 270 S.W.3d at 132. Further, the State did not argue that Appellant's subaverage intellectual functioning increased Appellant's future dangerousness or otherwise constituted an aggravating factor. The jury instruction and form correctly informed jurors that if they determined that Appellant proved mental retardation by a preponderance of the evidence, then they should answer the mental retardation special issue affirmatively. Contrary to Appellant's reading, the instruction did not invite jurors to answer the mental retardation special issue in the negative if they found that Appellant had proven mental retardation by a preponderance of the evidence but also believed that Appellant's mental retardation evidence militated in favor of the death penalty. On this record, I would not conclude that Appellant was deprived of a fair determination of the mental retardation special issue or that he was egregiously harmed by the jury instruction. *See id.* at 134. I would overrule point of error nine.

ARTICLE 37.071

In points of error ten and eleven, Appellant asserts that the trial court erred in denying his motions to hold Article 37.071 unconstitutional. In point of error ten, Appellant asserts that Article 37.071, sections 2(e) and 2(f), are unconstitutional because they impermissibly

---

of trial in determining whether it "militates for or mitigates against" a finding of *mental retardation—not* whether it "militates for or mitigates against" imposition of the death penalty in a more generalized sense. Here, the trial court embedded within the mental retardation special issue an instruction that the jury must consider all the evidence from both stages of trial to decide whether it "militates for or mitigation against the imposition of the death penalty." For the reasons given in the text, I would hold that this instruction, if error, was not egregiously harmful.

shift the burden of proof on mitigation to the defendant. In point of error eleven, Appellant asserts that Article 37.071, section 2(f), is unconstitutional because it limits mitigating evidence to evidence that reduces a defendant's blameworthiness. He acknowledges that we have rejected similar claims. *See, e.g., Davis v. State,* 313 S.W.3d 317, 355 (Tex. Crim. App. 2010); *Coble v. State,* 330 S.W.3d 253, 296 (Tex. Crim. App. 2010). I am not persuaded that we need to reconsider our previous decisions. I would overrule points of error ten and eleven.

Accordingly, I would affirm the judgment of the trial court. Because the Court does not, I respectfully dissent.

FILED:      January 27, 2016
PUBLISH