

NUMBER 13-17-00088-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

JOHNNY ANTHONY PALOMO,                                    Appellant,

v.

THE STATE OF TEXAS,                                           Appellee.

On appeal from the 93rd District Court
of Hidalgo County, Texas.

# MEMORANDUM OPINION

**Before Justices Rodriguez, Contreras, and Benavides**
**Memorandum Opinion by Justice Contreras**

Appellant Johnny Anthony Palomo was convicted of the capital murder of eleven-month-old Jeremy Villa Jr. *See* TEX. PENAL CODE ANN. § 19.03 (West, Westlaw through 2017 1st C.S.). Because the State did not seek the death penalty, appellant was automatically sentenced to life imprisonment without parole. *See id.* § 12.31(a) (West,

Westlaw through 2017 1st C.S.).  By two issues, appellant contends that (1) the trial court erred in denying his pre-trial motion to suppress a statement he made to police, and (2) the evidence was insufficient to support the conviction.  We affirm.

## I. BACKGROUND

In the early morning hours of November 29, 2014, police officers responded to a residence in Mercedes, Texas, where they found Vanessa Villa holding her infant son, "Junior," who was unconscious.  Officer Marco Castillo testified that the baby was limp, pale, and had a rapid pulse, blue lips, and clear liquid coming out of his mouth.  He advised Vanessa to "turn the boy over so it can get rid of that liquid."  Paramedics arrived, performed CPR, and transported the child to a hospital.  Castillo observed that, while the child was undergoing treatment at the hospital, Vanessa was "speaking on the phone like she was in a restaurant or something, real casual . . . giggling and laughing" and "wasn't distraught at all."  Castillo further stated that he detected the odor of marijuana both on Vanessa's person and in her residence.

The child was pronounced dead later that morning, and an autopsy was performed.  The pathologist concluded that the cause of death was "blunt force head trauma" and the manner of death was homicide.  The pathologist observed evidence of "significant inflicted head trauma" with "internal scalp contusions, subgaleal hemorrhage and subdural and subarachnoid hemorrhage (blood between the brain and skull and blood around the brain)."  Several explicit photographs from the autopsy were entered into evidence.  The pathologist acknowledged that there were no fractures to the child's skull, but noted that infants' skulls are "very pliable" and can "bow in without breaking."  She opined that it was not possible that the child had "bumped his head against the wall and hurt himself"

2

because that would not result in the "big blood collection within the cranial vault" that she observed. Instead, the autopsy evidence showed that the child was "beat about the head or slammed against an object."

Jeremy Villa, the biological father of the victim, testified that he lived with Vanessa before he was incarcerated for failure to pay child support in June of 2013. He stated that appellant began living with Vanessa and their three children after he went to jail. He found out about his son's death when Vanessa called him to ask him to explain to their four-year-old daughter Kaylee "that she is not going to see her brother no more." According to Jeremy, when he arrived at the home, Kaylee "said that whatever her mom was saying was a lie that my son didn't choke on the bottle." He stated that he now has full custody of Kaylee and the couple's other daughter, Janelle.

Elizabeth Hinojosa, Vanessa's sister, testified that she spoke to Kaylee on the morning after Junior died, and she recorded the conversation with her cell phone. Elizabeth stated she promised Kaylee "[n]ot to tell anybody" about what Kaylee reported, but "broke [her] promise" because "if somebody hurts or murders a . . . child, I have to tell." Elizabeth later played the cell phone recording for her mother, who was "very distraught, devastated" when she heard it. About a week later, she played the recording for Vanessa, at which point Vanessa got "all mad" and "immediately" went to another room to call appellant. A DVD copy of the cell phone recording was entered into evidence and the recording was played for the jury. The parties agree that, in the recording, Kaylee stated that appellant physically harmed Junior.[1]

---

[1] The recording of Kaylee's statement to Elizabeth is not part of the record before this Court. Further, no transcript of the recording appears in the record because the parties stipulated at trial that there was no need for the court reporter to transcribe the recording. But because the parties agree on the content of the statement, we need not request supplementation of the record to include the recording. *See* TEX. R.

3

Kaylee Villa testified at trial that she is seven years old and in the first grade, that she understands the difference between right and wrong, and that she understands the difference between the truth and a lie. She recalled that she used to live with Vanessa and appellant, where she shared a bedroom with Junior and her sister Janelle, and she shared a bed with Junior. She agreed that she had seen appellant "be mean" to Junior. On that occasion, she and Junior were sleeping on the floor when she heard a "bang on the wall." She opened her eyes fully and saw appellant "banging [Junior] to the wall" with "[h]is hand" three times, causing the child's head to hit the wall. Kaylee stated appellant looked "angry" when he did this. Appellant then put Junior on the ground "hard." Afterward, Vanessa came into the children's bedroom and asked Kaylee to get Vanessa's phone. She did so, and she could then hear her mother calling "[t]he police and the ambulance." According to Kaylee, before Vanessa called the police, appellant left the house "[s]o he wouldn't get in trouble." Kaylee testified that Junior was not sick, coughing, or crying when he went to sleep that night.

Kaylee stated she was "afraid" of appellant because "he might hurt me." She was unable to identify appellant in the courtroom. On cross-examination, she could not recall telling her aunt Elizabeth a "story" about what happened that night; she later stated the first person she told was her mother and the second person she told was her aunt. She could not recall telling police that appellant "threw [Junior] on the floor," and she denied that appellant threw the child on the floor. Kaylee opined that appellant was angry at Junior and "hates" him due to the fact that he "is always crying."

APP. P. 34.6(d); *see also* TEX. R. APP. P. 34.6(e)(1) ("The parties may agree to correct an inaccuracy in the reporter's record, including an exhibit, without the court reporter's recertification.").

4

Yolanda Leal, Vanessa's and Elizabeth's mother, testified that she met Vanessa at the hospital after leaving Elizabeth with the children. At the hospital, Vanessa was in shock, crying, and asking her son to "wake up." When Leal learned what was on Elizabeth's cell phone recording, she contacted police, and she gave the recording to investigators about two days later. According to Leal, when Vanessa first heard the recording, she "got really mad[]" and called appellant, asking "what did you do to my child." She agreed that the recording did not contain any accusations of wrongdoing against Vanessa.

Appellant's mother, Juventina Palomo, testified that, at some point after the child's death, appellant asked her if he could stay in a room at the hotel where she was working. Appellant stayed at the hotel for a day or two, borrowing Juventina's car on occasion, but then left when Juventina told him that she had seen him on the news. Later, appellant's father Jose Jesus Luna, who was estranged from Juventina, called her and told her that appellant was with him. Juventina advised Luna to call the police because she had seen on television that her son was wanted in connection with Junior's death. Subsequently, police arrested Juventina and questioned her regarding her son's whereabouts. She led police to Luna's house, where appellant was staying. She said she did not call police when Luna initially contacted her because she was afraid of her son.

Luna testified that appellant knocked on his door late at night on December 5, 2014 and asked to sleep at his house. It was the first time in about ten years that he had seen his son, and he did not know police were looking for him, so he agreed to let appellant sleep there. The following morning, police came to Luna's residence and arrested Luna; police then found appellant hiding in a closet and arrested him.

Vanessa testified that she pleaded guilty to four counts of intentionally or knowingly causing serious bodily injury to a child by omission, a first-degree felony, *see id.* § 22.04(a)(1), (e) (West, Westlaw through 2017 1st C.S.), and she was sentenced to twenty years' imprisonment, in connection with her son's death. She stated that she had been a certified nurse's assistant and that she had training in phlebotomy as well as CPR and EKG administration. She is married to Jeremy, but they separated, and she started seeing appellant in 2013 when she was pregnant with Junior. Appellant eventually moved in with her.

According to Vanessa, on the night in question, appellant came home at around 10:30 p.m. She got her children ready for bed while appellant was in her bedroom smoking marijuana. After Vanessa returned to her bedroom, appellant left the room for "a little longer than usual," and Vanessa heard a "loud bang like something fell." She testified:

> And I get up and I run out of my bedroom. And as I'm coming out of my bedroom Johnny is coming out of the kids room. And Johnny and I have domestic violence between each other. So I've seen him mad but the look he had on his face was like something was wrong. And I immediately asked him what happened. And he didn't say anything. He just pushed me back into my room and he started beating me. The next thing I know is I'm on my bed. . . . And he is like, babe, Junior, Junior, he is throwing up. . . . And I run into my kids room and my son is where I laid him down on there—I mean there is blankets usually on him but my son was laying there on the pillow and just on his back. And I picked up my son and—I picked up my son and he was gasping for air. And I get my daughter's suction machine. I was thinking he was aspirating on his bottle or something. I laid him on the bed and I put the suction machine on his nose and his mouth. This whole time Johnny was just standing by the doorway just looking.

She stated the "suction machine" was not working and the baby was still gasping for air, so she called the police. Vanessa testified that, while she was waiting outside for police or paramedics to arrive, "all of a sudden [appellant] comes out and he's at the doorway

6

saying, babe, you know, I want to be here but I got to go and he takes off." She stated she "let him go" because she knew he was wanted for a probation violation and he "didn't want to have contact with the cops." Vanessa conceded that, when police arrived, she falsely reported that appellant had not been at her house because she "wasn't supposed to have any contact with him or have him around me or my kids."

Vanessa stated that she initially believed Junior had died from choking on something, but came to believe something different after she heard her sister's recording of Kaylee's statement. Vanessa then asked Kaylee "what happened to Junior," and she replied that appellant "pushed Junior against the wall because he didn't want to go to sleep." Vanessa confronted appellant about Kaylee's statement but appellant denied hurting Junior. She later assisted investigators in finding appellant.

Vanessa subsequently agreed to meet appellant. Appellant picked her up and, as soon as she got in his car, he took her phone and removed the battery and SIM card. He then drove to a hotel, where he "turned his phone on and messages kept coming in and he was starting to freak out." He called someone on the hotel phone, asking to be picked up. At that point, he started "wiping down counters and everything" and saying "[w]e got to go, get your stuff." Appellant's mother picked the two up from the hotel, and appellant later got out of his mother's car and "t[ook] off." When Vanessa returned to her mother's house, her mother was crying because she heard on the news that appellant was wanted for capital murder and "they had another suspect" whom she assumed was Vanessa. The next day, after Junior's funeral, police arrested Vanessa.

Officer Gerardo Ramirez testified that he was the lead investigator in the case. He stated that, after Vanessa was interviewed by police, she was "not emotional" and was

7

"joking" with officers who were giving her forms to sign. However, he conceded she was "hysterical" and crying in the call she had made to police on the night in question.

On the day of appellant's arrest, appellant told police he felt ill and was observed "coughing up blood," so he was taken to the hospital. At the hospital, he gave a statement to Ramirez. According to Ramirez, appellant appeared "a little bit upset" and "agitated," but he was cooperative in giving the statement. Appellant signed and initialed a form indicating that he understood and was waiving his *Miranda* rights. A video recording of the statement appellant gave at the hospital was entered into evidence and played for the jury. At some point during the statement, the recording stopped. Ramirez speculated that this was because of "something with the memory or the battery of the camera." Another officer came in the interview room to advise Ramirez that the camera was not recording, at which point Ramirez stopped the interview. He resumed the interview after starting a digital audio recorder. The digital audio recording of the remainder of appellant's statement was also entered into evidence and played for the jury.[2] According to Ramirez, during the gap between the time the video recording ended and the audio recording began, he and appellant talked about injuries revealed by the autopsy, as well as whether appellant had been in contact with Vanessa since Junior's death.

---

[2] The recording of appellant's statement to police does not appear in the record before this Court. Further, as with the recording of Kaylee's statement, the State and defense counsel stipulated at trial that there was no need to have the recording transcribed. Nevertheless, the State does not dispute the following description of the substance of the statement contained in appellant's brief:

> [Appellant] gave a detailed oral statement to the police regarding the events on the day in question leading up to the child's death. While [appellant] acknowledged that he was present at the house that evening, that he entered the children's bedroom a couple of times, and that, at some point, in his effort to give baby ([Junior]) his bottle to go to sleep, he touched the child's stomach and chest, he vehemently denied that he had engaged in any conduct to harm the child, much less cause his death.

Again, because the parties agree on the substance of the statement, there is no need to request supplementation of the reporter's record to include the recording. *See* TEX. R. APP. P. 34.6(d), (e)(1).

8

After appellant gave his statement, he was taken to the police station "to prepare for the arraignment process." Ramirez stated that, as appellant was escorted to his cell, he "proceeded to resist and attempted to strike his head across the doorway to the jail." According to Ramirez, four or five officers were needed to "force" appellant into his cell, during which time appellant remarked "My life is over," "I'm fucked," and "something to the effect that I'm dead when I go in."

The jury found appellant guilty and the trial court rendered judgment in accordance with the verdict. This appeal followed.

## II. DISCUSSION

### A. Motion to Suppress

#### 1. Standard of Review and Applicable Law

In reviewing a trial court's ruling on a motion to suppress, we apply a bifurcated standard of review, giving almost total deference to a trial court's determination of historic facts and mixed questions of law and fact that rely upon the credibility of a witness, but applying a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility determinations. *Martinez v. State*, 348 S.W.3d 919, 923 (Tex. Crim. App. 2011).

We review the trial court's decision for an abuse of discretion. *Id.* "We view the record in the light most favorable to the trial court's conclusion and reverse the judgment only if it is outside the zone of reasonable disagreement." *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). The trial court's ruling will be upheld if it "is reasonably supported by the record and is correct on any theory of law applicable to the case." *Id.* However, a trial court has no discretion in determining what the law is or in applying the

9

law to the facts. *State v. Kurtz*, 152 S.W.3d 72, 81 (Tex. Crim. App. 2004).

When, as here, no findings of fact or conclusions of law are requested or filed, we assume the trial court made all findings in support of its ruling that are consistent with the record. *Carmouche v. State*, 10 S.W.3d 323, 327–28 (Tex. Crim. App. 2000); *cf. Vasquez v. State*, 411 S.W.3d 918, 920 (Tex. Crim. App. 2013) (holding that, when the issue is voluntariness of a confession, a trial court must file findings of fact and conclusions of law "whether or not the defendant objects to the absence of such omitted filing"); *State v. Cullen*, 195 S.W.3d 696, 700 (Tex. Crim. App. 2006) ("[U]pon the request of the losing party on a motion to suppress evidence, the trial court shall state its essential findings.").

Article 38.22, section 3 of the Texas Code of Criminal Procedure provides:

No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:

(1)  an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement;

(2)  prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above[3] and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;

(3)  the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has

---

[3] The warnings required by section 2(a) of article 38.22 are as follows:

(1)  [the accused] has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

(2)  any statement he makes may be used as evidence against him in court;

(3)  he has the right to have a lawyer present to advise him prior to and during any questioning;

(4)  if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5)  he has the right to terminate the interview at any time[.]

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a) (West, Westlaw through 2017 1st C.S.).

10

not been altered;

(4) all voices on the recording are identified; and

(5) not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant made under this article.

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a) (West, Westlaw through 2017 1st C.S.).

## 2. Analysis

By his first issue, appellant contends that the trial court erred by denying his motion to suppress evidence of the statement he made to police in the hospital following his arrest. Appellant notes that the recording contains a gap of several minutes in between the time the officers' video camera stopped recording and the time Ramirez activated his audio recorder.[4] According to appellant, the recording failed to comply with article 38.22 because it did not preserve his statement "in its entirety." Appellant moved to suppress this recording prior to trial, and a hearing was held, during which Ramirez gave testimony substantially similar to his trial testimony. The trial court denied the motion.

We observe that the statute does not explicitly state that the recording of an accused's oral statement must contain every single word uttered by the accused in his interaction with police. Instead, the statute requires only that the recording be "accurate," that its operator be "competent," and that the recording not be altered. *See id.* § 3(a)(3).[5] The evidence adduced at the suppression hearing established that Ramirez was

---

[4] Again, although the recording does not appear in the record, the parties agree as to its contents, including the "gap." *See* TEX. R. APP. P. 34.6(e)(1).

[5] Appellant does not dispute that he was advised of his *Miranda* rights; that he knowingly, intelligently, and voluntarily waived those rights; that the voices on the recording are identified; or that his counsel was timely provided with a copy of the recording. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a)(2), (4), (5).

11

competent and there is no suggestion that the recording was altered. And, although the video camera stopped recording at some point during appellant's statement, allegedly because it exceeded its storage capacity, it was "capable of making an accurate recording" as required by article 38.22. *See id.*

Appellant argues that the statute "implicitly requires that the ENTIRE oral statement (and not just portions of it) be made and preserved in some electronic format." However, the cases he cites do not support that proposition. *See Tigner v. State*, 928 S.W.2d 540, 546 (Tex. Crim. App. 1996) (holding that the term "proceeding," as used in section 3(a)(5) of article 38.22, "encompasses voir dire"); *Hernandez v. State*, 114 S.W.3d 58, 65 (Tex. App.—Fort Worth 2003, pet. ref'd) (holding that trial court erred by admitting evidence of defendant's unrecorded oral statement but finding such error harmless because the evidence was cumulative); *Pina v. State*, 38 S.W.3d 730, 735 (Tex. App.—Texarkana 2001, pet. ref'd) (holding that defendant's "responses or lack of responses" to officer's questions were "statements" as contemplated in article 38.22, section 3(a)(1)).

In any event, assuming but not deciding that the trial court erred in admitting the recording, appellant has not shown that he was harmed by the ruling. The erroneous admission of evidence is non-constitutional error which we must disregard unless appellant's substantial rights are affected. TEX. R. APP. P. 44.2(b); *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007). An error does not affect an appellant's substantial rights if, after examining the record as a whole, we have fair assurance that the error did not influence the jury, or had but a slight effect. *Casey*, 215 S.W.3d at 885; (citing *Garcia v. State*, 126 S.W.3d 921, 927 & n.9 (Tex. Crim. App. 2004)). Appellant contends that the "gap" in the recording "constituted a significant irregularity in that it

affected the integrity of his overall statement, and it invited the jury to speculate as to what [appellant] said in the missing portion of the statement." We disagree. The statement contained on the recording is generally favorable to appellant in that he denied causing harm to the child, and there was no evidence adduced at the suppression hearing or at trial that the "gap" was caused by anything other than an accidental technical oversight. Considering the entire record, we conclude that the admission of the recording did not affect appellant's substantial rights. Accordingly, any error in admitting the recording was harmless. *See* TEX. R. APP. P. 44.2(b).

Appellant further argues by his first issue that, to the extent Ramirez testified at trial as to the substance of oral statements made by appellant during the "gap" in recording, that testimony would not be admissible because there was no electronic recording made of those statements. This is true. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a). However, appellant's motion to suppress did not address evidence of any unrecorded remarks made during the "gap"—instead, the focus of the motion and hearing was entirely on whether the recorded parts of the statement were admissible at trial. Further, defense counsel did not object to Ramirez's testimony at trial on this basis. Accordingly, this particular argument has not been preserved for our review. *See* TEX. R. APP. P. 33.1.

We overrule appellant's first issue.

## B.    Evidentiary Sufficiency

In reviewing the sufficiency of the evidence to support a conviction, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable

13

doubt. *Griffin v. State*, 491 S.W.3d 771, 774 (Tex. Crim. App. 2016); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We resolve any evidentiary inconsistencies in favor of the verdict, keeping in mind that the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony. *Brooks*, 323 S.W.3d at 899; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West, Westlaw through 2017 1st C.S.). We determine, based upon the cumulative force of all of the evidence, whether the necessary inferences made by the jury are reasonable. *Griffin*, 491 S.W.3d at 774.

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal*, 286 S.W.3d at 327; *Malik*, 953 S.W.2d at 240. In this case, a hypothetically correct jury charge would instruct the jury to find appellant guilty if he: (1) intentionally or knowingly (2) caused the death of Junior, an individual younger than ten years of age. *See* TEX. PENAL CODE ANN. § 19.03.[6] A person acts intentionally

---

[6] The capital murder count in the indictment and jury charge contained four paragraphs, each alleging a different manner and means of committing the offense. Specifically, appellant was accused of intentionally or knowingly causing Junior's death: (1) by striking him against an object unknown to the grand jurors; (2) by throwing him with his hand, thereby causing him to collide with an object unknown to the grand jurors; (3) by pushing him against a wall with his hand; and (4) by manner and means unknown or unknowable to the grand jurors. We must uphold the verdict if the evidence is sufficient to support the allegations made in any one of the four paragraphs. *See Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) ("It is appropriate where the alternate theories of committing the same offense are submitted to the jury in the disjunctive for the jury to return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted.").

14

with respect to the result of his conduct when it is his conscious objective or desire to cause the result. *Id.* § 6.03(a) (West, Westlaw through 2017 1st C.S.). A person acts knowingly with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

Appellant argues that there was no physical evidence to support the jury's finding that he struck, threw, or pushed Junior against the bedroom wall. In particular, he notes that there was no evidence of any damage to the wall in Vanessa's house, nor was there any evidence from the autopsy, such as paint or sheetrock remnants, indicating that the child's head had struck the wall. Nevertheless, Kaylee testified that she saw appellant "bang [Junior] to the wall," causing his head to hit the wall three times. The autopsy confirmed that the child died from blunt force trauma to the head. The jury, as exclusive judge of the weight and credibility of witnesses' testimony, *see Brooks*, 323 S.W.3d at 899, was entitled to believe Kaylee's testimony despite the lack of corroborating physical evidence found at the crime scene.

Appellant further contends that no rational trier of fact could have found the requisite intent beyond a reasonable doubt. But intent may generally be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). Kaylee testified that appellant was angry at Junior for "always crying," and Vanessa stated that appellant "was just standing by the doorway just looking" as she attempted to revive her son. Vanessa further testified that appellant abruptly left her house after she had called the police to report Junior's injury. The evidence also established that appellant avoided arrest until, with the assistance of his mother, police were able to locate him hiding in his father's closet.

15

According to Ramirez, after appellant was arrested, he made several remarks indicating a consciousness of guilt.

Although the evidence regarding appellant's intent was not overwhelming, we conclude that it was sufficient to allow a rational trier of fact to conclude beyond a reasonable doubt that appellant, by his actions on November 29, 2014, either (1) had the conscious objective or desire to cause Junior's death, or (2) was aware that Junior's death was reasonably certain to be the result. *See* TEX. PENAL CODE ANN. § 6.03(a), (b).

Appellant's second issue is overruled.

### III. CONCLUSION

We affirm the trial court's judgment.

DORI CONTRERAS
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
25th day of October, 2018.