# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-18-00565-CR

---

**Luis Alberto DeLeon, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 207TH DISTRICT COURT OF COMAL COUNTY
### NO. CR2016-848, THE HONORABLE R. BRUCE BOYER, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

A jury convicted appellant Luis Alberto DeLeon of capital murder. *See* Tex. Penal Code § 19.03(a)(2). The district court rendered judgment on the verdict and sentenced DeLeon to life imprisonment without parole as required by law. *See id*. § 12.31(a)(2). In a single issue on appeal, DeLeon asserts that the evidence is insufficient to support his conviction. We will affirm the district court's judgment.

### BACKGROUND

The jury heard evidence that in the early morning of August 25, 2016, DeLeon and his friends, Anthony Cunningham and Sunee Schriewer, assaulted Christopher Lowe at a storage facility in New Braunfels and forced him into DeLeon's car. Once Lowe was inside the

car, DeLeon and Cunningham proceeded to stab Lowe repeatedly with knives before disposing of his body at a nearby cemetery.

Zoie Bartlett and her mother, Lita Lemmons, who had been socializing with DeLeon, Cunningham, and Schriewer on the night of the murder, witnessed the assault. Bartlett testified that the incident began when she, Lemmons, and Schriewer were in Bartlett's pickup truck following behind DeLeon and Cunningham, who were in a sedan headed toward the storage facility where DeLeon lived at the time.[1] As they approached the storage facility, Bartlett saw another man, Victor Mikesh, who was friends with Schriewer, running away from the facility with a phone in his hand. Bartlett's phone rang, and Schriewer answered it. Bartlett heard Schriewer scream, "Lowe, Lowe." Schriewer then hung up and called DeLeon, screaming into the phone, "Lowe. He's in the storage unit. Get Lowe. Get Lowe."[2] Schriewer then told Bartlett, who was driving the pickup truck, "Go, go, go. Follow them. Follow them."

Multiple security cameras at the storage facility recorded the arrival of Lowe, the sedan, and the pickup truck at the facility, and a "composite" of the recordings was admitted into evidence.[3] The composite showed Lowe arrive at the facility at approximately 2:03 a.m. in a truck, get out of the truck and walk toward the entrance gate, and then climb over the gate to enter the facility. Approximately 17 minutes later, DeLeon's sedan arrived at the facility and parked at the entrance gate. Cunningham got out of the car, jumped over a fence, and entered an

---

[1] DeLeon was homeless, as were Bartlett and her mother, who lived in their pickup truck and at a different storage facility in New Braunfels.

[2] The reason for the animosity between Lowe and the others is unclear from the record, although Lowe and DeLeon apparently had a dispute over property that was inside DeLeon's storage unit.

[3] The composite showed the view from each of the security cameras simultaneously.

2

access code into a keypad on the other side of the gate, causing the gate to open. Meanwhile, DeLeon retrieved what appeared to be a baseball bat out of the trunk of his car. DeLeon and Cunningham then got back into the sedan and drove into the facility, followed by Bartlett's pickup truck. The sedan sped through the facility to DeLeon's unit, while the pickup truck drove slowly to that same location.

Bartlett testified that as she approached DeLeon's unit, Schriewer jumped out of the truck and ran toward the unit. When Bartlett arrived at the unit, she observed the others assaulting Lowe on a bed inside the unit. Cunningham and Schriewer were punching him repeatedly with their fists and DeLeon was "swinging at him" with the baseball bat. Lowe had his hands up in a defensive position, attempting unsuccessfully to protect his face from the blows. At some point during the assault, Bartlett saw Lowe "standing up" at the edge of the bed, screaming and bleeding profusely from his head as he attempted to escape from the unit while DeLeon, Cunningham, and Schriewer continued to hit him and scream at him to "get out" of the storage unit. Eventually, they stopped hitting Lowe, grabbed him, and forced him out of the unit. DeLeon then got into his car and drove it in front of Lowe. DeLeon opened the back door and told Cunningham to "get that n***a" in the car. Cunningham complied and "shoved" Lowe into the back seat. Bartlett explained that Lowe tried to get out of the car before Cunningham "slammed" the door on him:

> He had half of his body in the vehicle and—like, his left-hand side was in the vehicle, but his right foot was still out and, like, part of his shoulder. And he tried to, like, lunge his body kind of out to get out (indicating). But then that's when Cunningham slammed it on him twice, and then kind of shoved him in there to get him in the vehicle all the way.

3

DeLeon and Cunningham proceeded to drive out of the storage facility, followed by Bartlett and her mother in the pickup truck. Bartlett later returned to the storage facility out of concern for Schriewer, who had remained behind to clean up the bloodstains around the unit.

DeLeon and Cunningham returned to the storage facility at approximately 4:50 a.m., without Lowe. DeLeon instructed everyone that they would remain inside the storage unit until sunrise and then leave and act like "nothing ever happened." While they were waiting for daylight, DeLeon told Bartlett that he and Cunningham had stabbed Lowe repeatedly in the car and that the car needed to be cleaned because it was "filled with blood." DeLeon added that as they stabbed him, he heard Lowe "gurgling blood" and that Lowe was "just not wanting to die."

Lowe's body was discovered at St. Joseph's Cemetery in New Braunfels at approximately noon that day. After performing an autopsy on the body, the medical examiner, Dr. Suzanna Dana, determined that Lowe had sustained "at least nine separate blows" to his head and twenty stab wounds across his body, all of which "appeared to be antemortem," i.e., occurring prior to death. Dr. Dana concluded that the cause of Lowe's death was blunt force head injury and multiple stab wounds. She explained that both the head injury and the stab wounds were listed as the cause of death because "either of them could have" caused death. Dr. Dana also testified that it was "hard to say" when Lowe had died but that "the combination of the stab wounds and the blunt head trauma would lead to incapacitation, not necessarily immediate death, and they could linger for minutes," although "certainly less than" 30 minutes. Dana explained that a person "could die pretty quickly, in less than a minute or two, or they could linger for a while. They would be unconscious, but they would linger for a while until their actual heart stopped beating and the—the breathing ceased." Dana estimated that Lowe had

4

died "probably" more than 12 hours before his body had been found at the cemetery but "less than about 24" hours. She added, however, that this was not a "hard-and-fast number" because "there's a lot of variables" involved in determining a person's time of death, resulting in "a very broad range" of time in which death could have occurred.

The jury found DeLeon guilty of capital murder as charged in the indictment, which alleged that DeLeon had caused Lowe's death "in the course of committing or attempting to commit kidnapping." This appeal followed.

## STANDARD OF REVIEW

"The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence." *Braughton v. State*, 569 S.W.3d 592, 607 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979); *Brooks v. State*, 323 S.W.3d 893, 917 (Tex. Crim. App. 2010)). "In assessing the sufficiency of the evidence to support a criminal conviction, 'we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt.'" *Id*. at 607–08 (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

"This familiar standard 'recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence.'" *Braughton*, 569 S.W.3d at 608 (quoting *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011)). "'On review, this Court determines whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of all the evidence.'" *Id*. "When the

record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012) (citing *Jackson*, 443 U.S. at 326). "As a reviewing court, we may not reevaluate the weight and credibility of the evidence in the record and thereby substitute our own judgment for that of the factfinder." *Braughton*, 569 S.W.3d at 608 (citing *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)). "Although the parties may disagree about the logical inferences that flow from undisputed facts, '[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.'" *Id.* "A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony." *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018).

## ANALYSIS

A person commits the offense of capital murder if he intentionally causes the death of an individual in the course of committing or attempting to commit a specified offense, in this case, kidnapping. Tex. Penal Code §§ 19.02(b)(1), .03(a)(2). "In the course of committing," as used in the capital-murder statute, is defined as "conduct occurring during an attempt to commit, during the commission of, or in immediate flight from, the forbidden behavior." *Griffin v. State*, 491 S.W.3d 771, 774–75 (Tex. Crim. App. 2016) (citing *Rivera v. State*, 808 S.W.2d 80, 93 (Tex. Crim. App. 1991)); *see Riles v. State*, 595 S.W.2d 858, 862 (Tex. Crim. App. 1980); *McDuff v. State*, 943 S.W.2d 517, 526 (Tex. App.—Austin 1997, pet. ref'd).

A person commits the offense of kidnapping if he intentionally or knowingly abducts another person. Tex. Penal Code § 20.03(a). "Abduct" means to restrain a person with

6

intent to prevent his liberation by secreting or holding him in a place where he is not likely to be found or by using or threatening to use deadly force. *Id*. § 20.01(2). "Restrain" means to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person. *Id*. § 20.01(1). Restraint is "without consent" if it is accomplished by force, intimidation, or deception. *Id*.

"A kidnapping becomes a completed offense when (1) a restraint is accomplished, and (2) there is evidence that the actor had the specific intent to prevent liberation by secretion or the use or threatened use of deadly force." *Griffin*, 491 S.W.3d at 775 (citing *Santellan v. State*, 939 S.W.2d 155, 162 (Tex. Crim. App. 1997)). "In order to support a conviction for capital murder, the State is required to prove that appellant developed the requisite specific intent for [] kidnapping at the time of the victim's death or before that point." *Santellan*, 939 S.W.2d at 162.

In this case, DeLeon does not challenge the sufficiency of the evidence supporting the jury's finding that he intentionally caused Lowe's death. Instead, he asserts that the evidence is insufficient to prove that he did so "in the course of committing or attempting to commit kidnapping." According to DeLeon, his intent upon arrival at the storage facility was to kill Lowe, not to kidnap him, and placing Lowe in the car was merely an "afterthought" that occurred to DeLeon after he and his friends had beaten Lowe to death or near-death. In DeLeon's view, this was, at most, a case of "kidnapping in the course of murder" rather than "murder in the course of kidnapping." Moreover, DeLeon contends that because "there was no conclusive evidence that [Lowe] was alive" at the time DeLeon and Cunningham left the storage facility, "there could be no kidnapping at all" because Lowe was already dead at that time.

As support for his contentions, DeLeon cites to *Herrin v. State*, 125 S.W.3d 436 (Tex. Crim. App. 2002), and *Griffin v. State*, 491 S.W.3d 771 (Tex. Crim. App. 2016).

7

In *Herrin*, the defendant walked up to the victim, shot him in the torso, and, after the victim was dead, moved the body and hid it in the woods. 125 S.W.3d at 438–39. The defendant was convicted of capital murder committed while in the course of committing or attempting to commit kidnapping. *Id*. at 437–38. The Court of Criminal Appeals concluded that the evidence was insufficient to support a capital-murder conviction because at the time of the shooting, the defendant's "clear and un-diverted intent was to kill" the victim, and in light of that intent, the defendant's "moving of [the victim's] body after the shooting did not amount to evidence that [the defendant] was in the course of a kidnapping when the murder took place." *Id*. at 440. The court also noted that a capital-murder conviction was "contrary to the principle that a dead body cannot be kidnapped." *Id*. at 440 n.7.

In *Griffin*, the defendant killed a woman in her apartment and, after killing her, assaulted and restrained the woman's son, who had witnessed the murder. 491 S.W.3d at 773–74. The defendant was convicted of capital murder committed while in the course of committing or attempting to commit the offense of kidnapping. *Id*. at 773. The Court of Criminal Appeals concluded that the evidence was insufficient to support a capital-murder conviction because "it was only after the murder, with [the woman] dead on the floor of her bedroom, that appellant restricted [the son's] movements without consent and interfered substantially with his freedom of movement." *Id*. at 775. The court added that "a felony that is committed as an afterthought and unrelated to the murder is not sufficient to prove capital murder." *Id*. at 776. "In this case, appellant assaulted [the son] only after [the woman's] murder was completed, seemingly to eliminate a witness to that murder." *Id*. "Because the murder was complete before the attack on [the son] . . . the evidence does not support a conviction for capital murder." *Id*.

8

This case is distinguishable from both *Herrin* and *Griffin*. In those cases, no evidence tended to show that the defendant took any action or formed any intent to commit a kidnapping prior to the completion of the murder. Here, in contrast, the jury heard evidence from which it could have reasonably inferred that DeLeon intended to kidnap (and did kidnap) Lowe prior to completing the murder. Before the assault began, Bartlett heard Schriewer informing DeLeon that Lowe was at the storage unit and instructing DeLeon that they needed to "Get Lowe." The jury could have reasonably inferred that this meant that DeLeon and his accomplices intended to attack Lowe at DeLeon's storage unit, where Lowe was apparently trespassing at the time, and forcefully remove him from the unit.

The record supports this finding. Bartlett testified that as DeLeon, Cunningham, and Schriewer were assaulting Lowe, Cunningham was telling Lowe to "go, go, go," "move," and "get out" of the unit and that Lowe was "struggling" and "trying" to get out but that an object in his path was "blocking his walking" and preventing him "from coming out." However, DeLeon, Cunningham, and Schriewer "were still screaming at him, yelling at him to go, go, go." Bartlett testified that they eventually "kind of stopped beating him but were still forcing him . . . then grabbing him and . . . making him move, like, walk out all the way" outside the unit. The jury could have reasonably inferred that by assaulting Lowe and forcefully removing him from the unit, DeLeon and his accomplices were trying to make it easier to get Lowe into DeLeon's car.

Once they had forced Lowe outside the storage unit, DeLeon retrieved his vehicle, opened the back door, and instructed Cunningham to put Lowe inside the car. Bartlett provided testimony from which the jury could have reasonably inferred that Lowe was still alive at that time, including her observation that Lowe had attempted to "lunge" out of the car before

9

Cunningham slammed the door shut on him. DeLeon's actions in retrieving the car, opening the back door, and instructing Cunningham to place Lowe inside the car, while Lowe was still alive, support the jury's finding that DeLeon had "developed the requisite specific intent for [] kidnapping at the time of the victim's death or before that point." *See Santellan*, 939 S.W.2d at 162.

The record also supports a finding by the jury that Lowe was still alive after he had been forced inside the car and DeLeon and Cunningham had left the storage facility and were transporting Lowe to the cemetery. The medical examiner testified that it was possible for a person who had sustained Lowe's head injuries to remain alive for up to 30 minutes, and Bartlett testified that DeLeon had told her that as he and Cunningham were stabbing Lowe repeatedly, DeLeon heard Lowe "gurgling blood" and that Lowe was "just not wanting to die." The medical examiner testified that the stabbing of Lowe also could have caused his death. Thus, the jury could have reasonably inferred that Lowe was still alive when he was stabbed in the car, and the stabbing caused his death.

Viewing the above evidence in the light most favorable to the verdict, we conclude that it is sufficient to prove that DeLeon caused Lowe's death while in the course of committing the offense of kidnapping. *See id*. at 163 (concluding that evidence was sufficient to support finding that murder was committed in course of committing kidnapping when defendant confessed that victim, whom he had shot, "may have still been alive" when he loaded her into his car and drove away and medical examiner also testified that victim could have been alive at that time); *Dowthitt v. State*, 931 S.W.2d 244, 250 (Tex. Crim. App. 1996) (explaining that in prosecution for capital murder, it does not matter if defendant formed intent to commit murder before forming intent to commit underlying offense; what matters is whether victim "was still

10

alive" at time underlying offense was committed); *Robertson v. State*, No. 10-13-00105-CR, 2015 Tex. App. LEXIS 3871, at *11–13 (Tex. App.—Waco Apr. 16, 2015, pet. ref'd) (mem. op., not designated for publication) (rejecting defendant's contention that kidnapping must have occurred prior to time when he first stabbed victim; evidence that defendant drove victim in his car, "while [she] was still alive," was sufficient to prove defendant intended to kidnap victim prior to her death); *see also Rayford v. State*, 125 S.W.3d 521, 526–27 (Tex. Crim. App. 2003); *Swearingen v. State*, 101 S.W.3d 89, 96–97 (Tex. Crim. App. 2003). Accordingly, the evidence is sufficient to support DeLeon's conviction for capital murder.

We overrule DeLeon's sole issue on appeal.

## CONCLUSION

We affirm the district court's judgment of conviction.

_____

Gisela D. Triana, Justice

Before Justices Goodwin, Baker, and Triana

Affirmed

Filed:   October 1, 2019

Do Not Publish