

# NUMBER 13-23-00034-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

OMAR ROLANDO GUERRA, Appellant,

v.

THE STATE OF TEXAS, Appellee.

## On appeal from the 36th District Court of San Patricio County, Texas.

# MEMORANDUM OPINION

### Before Chief Justice Contreras and Justices Benavides and Tijerina
### Memorandum Opinion by Chief Justice Contreras

Appellant Omar Rolando Guerra was convicted on one count of capital murder, and because the State did not seek the death penalty, he was automatically sentenced to life imprisonment without parole. *See* TEX. PENAL CODE ANN. §§ 12.31(a)(2), 19.03. On appeal, he argues by one issue that the evidence was insufficient to support the conviction. We affirm.

## I.    BACKGROUND

The indictment alleged that, on or about January 23, 2021, appellant (hereinafter referred to as Omar) and his brother Alex Guerra intentionally or knowingly caused the death of Joseph Degrange Reeder by shooting him with a firearm, and in the same criminal transaction, they intentionally or knowingly caused the death of Rebekah Degrange by shooting her with a firearm. *See id.* § 19.03(a)(7). Omar and Alex were tried together.

At trial, Jerry Marshall testified that he lives in a trailer park in Aransas Pass; that siblings Joseph and Rebekah lived in a trailer at the same property; and that Alex also lived in a trailer at the property. At around 9:00 p.m. on January 23, 2021, Marshall was taking out trash when he noticed a man dressed in a gray hoodie and blue jeans about halfway between Joseph and Rebekah's trailer and Alex's trailer. Marshall observed the man "walk into [Joseph and Rebekah]'s trailer" and "fire six shots." Marshall then went back inside his trailer and called 911. Marshall said he knew what Alex's truck looked like, but it was not at the trailer park at the time of the shooting. He did not see Omar or Alex at the trailer park that evening, and he was not able to identify the shooter at trial.

Police arrived at the scene and found Joseph and Rebekah deceased from gunshot wounds.[1] They recovered evidence including five shell casings. Based in part on information that Joseph had previously organized an assault against Omar while they were incarcerated together, police obtained a warrant for Omar's arrest, and they arrested

---

[1] The medical examiner testified that Joseph died from gunshot wounds to the face, chest, and neck; whereas Rebekah died from a gunshot wound to the face and also had gunshot wounds on her shoulder and hand. Both victims were shot at close range, and both tested positive for methamphetamine at the time of death.

him at his workplace in Rio Grande City.[2] Investigators recovered a bulletproof vest and a pair of jeans, among other things, from Omar's residence and car. Forensic analysts determined that the jeans contained DNA from Omar as well as another person, and Rebekah could not be excluded as a possible contributor of the DNA; analysis of the bulletproof vest revealed only Omar's DNA; and analysis of the shell casings did not result in any pertinent findings. Police also made contact with Omar's then-girlfriend Jessica Villarreal, and they recovered a gray hoodie from her car. However, according to police, Marshall denied that this was the same gray hoodie which the suspect was wearing at the time of the shooting, so it was not submitted for forensic testing. No murder weapon was recovered.

Aracely Lamberton testified she is married to Aaron Guerra, Omar and Alex's brother, though they were separated and intended to divorce. On the evening of January 23, Lamberton received a call from Omar, who was attempting to reach Aaron. At Aaron's request, Lamberton told Omar that Aaron was asleep. Omar then asked Lamberton to "turn off" some cameras that Aaron had installed on an RV at the trailer park. Lamberton testified: "I thought he was joking because he was always joking with me and I say what cameras, we don't have any cameras. And he said okay and he h[u]ng up the phone."

Gale Degrange, the mother of Joseph and Rebekah, testified that she owned the trailer park where the murders took place. She knew Omar because Omar was trying to help Joseph obtain a job in Georgia and because, from 2017 to around 2019, Omar had rented the same trailer where Joseph and Rebekah lived when they died. Gale testified

---

[2] Police also obtained a photo from the United States Border Patrol checkpoint in Falfurrias, showing Omar traveling northbound at 5:53 p.m. on January 23, 2021.

she had outdoor surveillance cameras installed around the property, including one mounted on a tree and pointed directly at Joseph and Rebekah's trailer. According to Gale, that particular camera had been operational until the night of the murders, when its cable was cut. Photos showing the severed cable were entered into evidence, as were certain video recordings from that camera and others.

On cross-examination, Gale acknowledged that, when she spoke to police, she named several other associates of Joseph who were present at his trailer earlier on the day of the murders. She also said that Joseph had been arrested for murder several years ago, but the case was dropped.

Excerpts from video recordings taken by the surveillance cameras on the night of the murders were played for the jury. The recordings show that Alex arrived at the trailer park in his truck at 7:02 p.m.,[3] accompanied by his then-girlfriend Lisa Salazar. At 7:47 p.m., Omar arrived in his car. About nine minutes after that, Omar can be seen outside his car putting on a bulletproof vest and light-colored hoodie. At 8:05 p.m., Omar can be seen wearing body armor but not a hoodie, walking from his car to Joseph and Rebekah's trailer. At 8:07 p.m., Rebekah can be seen returning home to her trailer; meanwhile, Alex and Omar can be seen tending to a barbecue grill about twenty feet away, though the image is partially obscured by Alex's truck. At 8:09 p.m., Omar can be seen, again wearing body armor but no hoodie, walking from his car toward and past the camera mounted to the tree. At 8:10 p.m., the video from the tree-mounted camera abruptly cuts to black; police believed that this was when the video cable was cut, because no further

___

[3] The timestamps included on the recordings do not accurately reflect the actual times the videos were recorded. Police were able to determine the actual times by syncing up the surveillance videos with correctly timestamped footage from bodycams worn by officers at the scene.

4

footage was recorded from that particular camera. From other cameras on the property, Omar's car can be seen leaving the trailer park at around 9:00 p.m., and Alex's truck can be seen leaving about a minute later. Marshall made his 911 call at 9:02 p.m.

Testifying for the defense, Salazar stated that she was at the trailer park that night attending the barbecue with Alex. She said that Omar arrived with Villarreal and a small child, whom she assumed was Villarreal's son. At some point, she asked Alex to take her home to Corpus Christi because her daughter needed a ride to work. According to Salazar, Omar left in his car with Villarreal and the child before Salazar left with Alex. She testified she saw that Omar was driving and had his "hands out saying bye." However, Salazar conceded that, though she can see "shadows," she is legally blind. Moreover, Salazar agreed on cross-examination that she previously served probation on a felony forgery charge. *See* TEX. R. EVID. 609 ("Impeachment by Evidence of a Criminal Conviction"). And she admitted that, when she previously spoke to police about the murders, she said she did not see Omar driving, and she did not know whether Omar and Villarreal left together. Instead, in response to police questioning, she said it was possible that Omar stayed behind.

Villarreal, also testifying for the defense, stated that she and her one-year-old son accompanied Omar to Aransas Pass on January 23, 2021, for the barbecue at Alex's trailer. At some point, she saw a "silhouette of someone" "standing like in the shadows" in the trailer park, so she "panick[ed]" and asked Omar if they could leave. She said that she, her son, and Omar left the trailer park before Alex and Salazar left; she said she was driving Omar's car because Omar had been drinking. She told police that Omar could not have committed the murders because he was sitting next to her in the car. She knew that

5

Omar owned body armor; however, she said that he "was just a show off" and "liked to wear it," including "around . . . the apartment." On cross-examination, Villarreal acknowledged that, in the surveillance videos, it does not appear that Omar was staggering or stumbling, and he did not have difficulty strapping on the body armor. Moreover, she admitted that she previously told police that Alex and Salazar left the trailer park before she and Omar left.

The jury was instructed on the law of parties. *See id.* § 7.02(a)(2). It found Omar guilty as charged, and it found Alex not guilty. This appeal followed.

## II.    DISCUSSION

### A.    Standard of Review and Applicable Law

To satisfy constitutional due process requirements, a criminal conviction must be supported by sufficient evidence. *See Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). "Evidence is sufficient to support a criminal conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In a sufficiency review, we view the evidence in the light most favorable to the verdict and consider all of the admitted evidence. *Id.* We consider both direct and circumstantial evidence as well as all reasonable inferences that may be drawn from the evidence and are not mere speculation. *See id.*; *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses"; therefore, "[w]hen the jury could reasonably draw conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict." *Stahmann*, 602 S.W.3d

6

at 577; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04.

Sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). A hypothetically correct charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* (citing *Malik*, 953 S.W.2d at 240). "The law 'authorized by the indictment' consists of the statutory elements of the offense as modified by the indictment allegations." *Id.*

Here, a hypothetically correct charge would instruct the jury to find Omar guilty of capital murder as charged in the indictment if he: (1) intentionally or knowingly caused Joseph's death by shooting him with a firearm; and (2) during the same criminal transaction, intentionally or knowingly caused Rebekah's death by shooting her with a firearm. *See* TEX. PENAL CODE ANN. § 19.03(a)(7).

A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. *Id.* § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). Intent may generally be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

**B.    Analysis**

Omar contends that the evidence against him at trial was circumstantial and did

not support a finding of guilt beyond a reasonable doubt. He emphasizes that Marshall, the only eyewitness to the shootings, could not identify the perpetrator. Further, he argues that the scientific evidence did not establish his culpability; in particular, he notes that the victims' DNA was not found on his clothing; the casings found at the scene did not contain his DNA or fingerprints; and the hoodie found in Villarreal's car was not tested for DNA. He contends that, if he truly shot Joseph and Rebekah at close range as alleged by the State, there would have been physical evidence such as the victims' DNA on his clothing.

It is true, as Omar argues, that the evidence adduced against him at trial was entirely circumstantial, but "[c]ircumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt." *Winfrey v. State*, 393 S.W.3d 763, 771 (Tex. Crim. App. 2013). The question we must ask is whether, based upon the cumulative force of all of the evidence, the necessary inferences made by the jury are reasonable. *Griffin v. State*, 491 S.W.3d 771, 774 (Tex. Crim. App. 2016); *Hooper v. State*, 214 S.W.3d 9, 17 (Tex. Crim. App. 2007). "[J]uries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions." *Hooper*, 214 S.W.3d at 15. "Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented." *Id.* at 16. On the other hand, "an inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Id.* A conclusion reached by speculation "is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt." *Gross v. State*, 380 S.W.3d 181, 188 (Tex. Crim. App. 2012).

In this case, the circumstantial evidence included Marshall's testimony that a man wearing a gray hoodie and blue jeans fired six gunshots into Joseph and Rebekah's

8

trailer, as well as the medical examiner's testimony that Joseph and Rebekah each died from three gunshot wounds. It also included surveillance video showing that, about an hour before the shooting, Omar arrived at the murder scene and donned a bulletproof vest and light-colored hoodie. Omar approached Joseph and Rebekah's trailer; about ten minutes later, he approached the surveillance camera pointed at the trailer, and the video feed from that camera abruptly cut out shortly thereafter. Lamberton testified that Omar called her on the day of the murder to ask his brother Aaron to disconnect other cameras which were installed at the property. Finally, testimony established that Joseph previously organized an assault against Omar while they were incarcerated together. From this evidence, a rational juror could reasonably infer that Omar was the man Marshall saw shooting into Joseph and Rebekah's trailer. A rational juror could also infer that, when Omar fired those shots, he did so either intending to cause Joseph's and Rebekah's deaths or knowing that their deaths were reasonably certain to result from his actions. *See* TEX. PENAL CODE ANN. § 19.03(a)(7).

Omar suggests that, because the victims were allegedly involved in drug trafficking, and because the trailer park was known to be a dangerous area, it was unreasonable for the jury to infer that his wearing of body armor was indicative of his intent. We disagree. This inference was a logical conclusion from the evidence, not mere speculation. *See Hooper*, 214 S.W.3d at 15. Omar also suggests that the evidence of his prior dispute with Joseph does not support an inference that he had a motive to kill Joseph because the dispute was several years ago and because Joseph was, at the time of his death, helping Omar to find a job. Again, we disagree. Motive is not an element of capital murder. *See* TEX. PENAL CODE ANN. § 19.03. Defense counsel did not object to the

9

evidence of Omar's earlier conflict with Joseph on relevance or any other grounds. In any event, the jury was the sole judge of the weight to give the evidence, and it could have reasonably inferred, based on all the circumstantial evidence, that Omar was the shooter. *See Stahmann*, 602 S.W.3d at 577.

Omar observes that there was contrary evidence for the jury to consider. In particular, Salazar and Villarreal stated Omar departed the trailer park before the shooting. However, both of these witnesses equivocated on cross-examination. Even if their stories were fully consistent, the jury was free to disbelieve them. *See id.*

For the foregoing reasons, we conclude the evidence was sufficient to support Omar's conviction for capital murder.[4] His issue on appeal is overruled.

### III.    CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
21st day of December, 2023.

---

[4] Because of our conclusion that the evidence supported Omar's conviction as a principal to the offense, we do not address whether the evidence supported his conviction as a party. *See* TEX. R. APP. P. 47.1.